**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Encarnacion MORENO, Justiniano Orguiza, and Joseph Martinez Ruiz, a/k/a Alberto Alvarez, Defendants-Appellants.**

No. 88-2457
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

July 14, 1989.

Roland E. Dahlin, II, Federal Public Defender, Marjorie A. Meyers, Asst. Federal Public Defender, Houston, Tex., for Moreno.

Luis A. Martinez, Houston, Tex. (court appointed counsel), for Ruiz.

William W. Burge, Houston, Tex., for Orguiza.

Paula C. Offenhauser, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Tom Meehan, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before GEE, WILLIAMS, and HIGGINBOTHAM, Circuit Judges.

GEE, Circuit Judge:

This appeal arises from a joint jury trial in which the three defendants were convicted on a variety of charges relating to the possession and importation of 5000 grams of cocaine. On appeal all defendants contend that the trial court erred in rejecting their challenge to the prosecutor's exercise of his peremptory strikes in what the defendants contend was a discriminatory fashion. In addition, each defendant raises individual challenges to his or her own convictions. Specifically, Moreno contends that the evidence was insufficient to sustain her conviction for importing cocaine; Orguiza contends that the evidence was insufficient to sustain his conviction for conspiracy to possess cocaine; and Ruiz contends that the district court erred in failing to make a finding on the record that the probative value of using his prior convictions for impeachment purposes outweighed the prejudicial effect of that use.

We conclude that the district court did not err in rejecting the defendant's challenge to the prosecutor's exercise of his peremptory strikes. In addition, we find that the evidence was sufficient to sustain Moreno's conviction for importing cocaine. On the other hand, we find that the evidence was not sufficient to sustain Orguiza's conviction for conspiracy to possess cocaine. Finally, we conclude that the district court erred in failing to make an on the record finding regarding the probative value versus prejudicial effect of using Ruiz's prior convictions for impeachment purposes. Consequently, we affirm in part, reverse in part, and remand.

*Facts*

In the fall of 1987, Virgilio Beltran, an informant working with the United States Customs department, was employed as a licensed ship navigator aboard the Royal Star. In November of that year Beltran met Moreno and her husband, Palmyra, at a restaurant in Buenaventura, Columbia. Palmyra asked Beltran to smuggle five kilograms of cocaine into the United States aboard the Royal Star. Palmyra told Beltran that Moreno would receive the cocaine in the United States and would give Beltran $4,500 per kilogram at the time of delivery. Beltran agreed to smuggle the cocaine at which time Moreno supplied Beltran with a written telephone number and the name "Justo." Beltran was to contact "Justo" in the United States to make arrangements to deliver the cocaine. Beltran then tore a 200 peso bill in half, gave one half to Moreno, and instructed her that once in the United States she would receive the cocaine from a person holding the other half of the 200 peso bill.

Palmyra delivered the cocaine to Beltran who hid it aboard the Royal Star. The ship arrived in Houston, Texas on November 14, 1987. In Houston Beltran turned the cocaine, the half of the 200 peso bill, and the telephone number over to Special Agent Brooks of the United States Customs. A call was placed to the telephone number given Beltran, but a female answered and indicated that "Justo" had moved the previous week. Beltran left the cocaine with Agent Brooks and returned to Columbia about November 24th or 25th. Beltran contacted Palmyra in Columbia and informed him that he, Beltran, had been unable to contact "Justo." Palmyra supplied Beltran with a second Houston telephone number and the name "Tana" as well as a Newark, New York telephone number.

Beltran returned to Houston on December 3, 1987 and relayed the new delivery information and telephone numbers to Agent Brooks. Beltran made a series of taped telephone calls to "Tana" at the Houston telephone number and agreed to meet the person to whom the cocaine was to be delivered between 4:00 and 4:30 p.m. at a Houston Restaurant. In order to make a controlled delivery, Beltran was given the cocaine that he had previously left with Agent Brooks.

While Beltran was arranging to deliver the cocaine Customs agents set up surveillance on the apartment corresponding to the telephone number. At about noon Moreno and Orguiza came out of the apartment, looked around, and returned to the apartment. At approximately 12:50 p.m. Ruiz entered the apartment. About 20 minutes later co-defendant Botello[1] and a person named Melendez entered the apartment. Moreno and Ruiz left the apartment for about fifteen minutes between 2:30 p.m. and 2:45 p.m. At about 3:00 p.m. Moreno and Ruiz left in a black Chrysler.

Beltran and Harris County undercover officer Stamper met Ruiz and Moreno at the pre-arranged site. Moreno indicated that she did not have all the money she owed Beltran and the parties discussed picking up the rest of the money that evening. Ruiz left briefly and returned with a bag of money. At that time Moreno and Officer Stamper got into the undercover vehicle. Stamper gave the cocaine to Moreno who smelled the package without opening it and said "good." Moreno gave Stamper $500 in cash and returned to her vehicle carrying the cocaine. Ruiz gave Beltran $6000 in cash and told him he could pick up the remainder of the money owed to him that evening. Ruiz and Moreno were arrested at the transaction site. The torn half of the 200 peso bill was recovered from their vehicle.

At approximately 6:15 p.m. Orguiza came out of the apartment which was under surveillance. The surveillance officers detained Orguiza who gave the officers the key to the apartment. The officers searched the apartment pursuant to a search warrant. In the apartment the officers found Moreno's passport, an airline ticket in Moreno's name for a flight from Columbia to Houston through New York, a piece of paper bearing the name "Royal

1. Botello plead guilty prior to trial and is not involved in the appeal.

Star" and the telephone number of the ship's broker, a piece of paper bearing several telephone numbers and the name "Justo," and a piece of paper bearing the number of the digital pager that Ruiz was wearing at the time of his arrest. In addition the officers discovered a Houston City water receipt made out to defendant Orguiza. The address on the receipt corresponded to the address of the original telephone number given to Beltran in Columbia in November.

Moreno was indicted for conspiracy to possess cocaine with intent to distribute it, for importing cocaine into the United States and for possession of cocaine with intent to distribute it. Ruiz and Orguiza were charged with conspiracy to possess cocaine with the intent to distribute it. The defendants were convicted following a jury trial and this appeal followed.

### Analysis

#### A. The Peremptory Strikes

Each of the defendants is black and hispanic. The venire consisted of forty-one individuals. Six of the veniremen were black and eight had Hispanic surnames. The government had six peremptory strikes, all of which it used to excuse black or hispanic veniremen. The jury consisted of ten whites, two blacks, with one white alternate and one hispanic alternate. Additionally, several of the jurors spoke Spanish. The defendants contend that the prosecutor used his peremptory strikes to excuse jurors solely on account of their race and in violation of the equal protection clause of the Fourteenth Amendment.

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that: "The equal protection clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable to impartially consider the state's case against a black defendant." *Id.* at 89, 106 S.Ct. at 1718. Consequently, a prosecutor is authorized to peremptorily challenge minority jurors only if the state can demonstrate a racially neutral reason for the challenge.

There are three elements to a prima facie case under *Batson.*

> First, defendant "must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." Second, defendant can rely on the fact that peremptory challenges may disguise racial discrimination. Third, "the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*United States v. Forbes,* 816 F.2d 1006 (5th Cir.1987) (citations omitted).

Once a defendant has made a prima facie showing that the prosecutor's strikes were racially motivated, the burden shifts to the government to "come forward with a neutral explanation for challenging" the jurors of the defendant's race. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723.

 In this case the defendants made their prima facie case under *Batson.* At the request of defense counsel the court then required that the prosecutor offer neutral explanations for his challenges. The prosecutor stated that he struck juryman number 13, a black man, because the prosecutor detected a hostile attitude toward police officers during defense voir dire. The prosecutor struck juryman number 16, a hispanic man, because of his response to questions regarding the problems that the city had recently had with its undercover officers. Juror number 21, a hispanic male, juror number 26, a black female, and juror number 28, a black female, were stricken because the prosecutor believed that they would not impartially view the evidence due to the fact that they were young, single, unemployed and inexperienced. In addition, juror number 28 had previously served on a jury in a case involving cocaine and a guilty verdict had not been reached. The prosecutor struck alternate juror number 34, a hispanic male, based on the prosecutor's "gut reaction" that a commercial artist would have sympa-

thy for persons involved with drugs. The defendants challenged the government's explanations on the grounds that they were "pretext." The district court responded with a finding that "the government's explanations are accurate."

Where, as here, the district court requires the prosecution to explain its use of its peremptory challenges and finds no racial discrimination, the appellate court's review is a deferential one. *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir.1987). "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Id.* at 1010. As we noted in *United States v. Terrazas-Carrasco*, 861 F.2d 93, 95 (5th Cir.1988). "Valid reasons for exclusion may include 'intuitive assumptions' upon confronting a veniremen ... eye contact, demeanor, age, marital status, and length of residence in the community." Here the prosecutor provided valid neutral explanations for each of its strikes. The district court evaluated the credibility of the explanations and found that they were not pretextual. Giving "great deference" to these findings, we conclude that the court did not err in rejecting the defendant's challenge to these strikes.

### B. *Sufficiency of the Evidence—Moreno*

■ Moreno contends that the evidence was insufficient to sustain her conviction for importing cocaine into the United States. Moreno's first argument is that the cocaine was actually brought into the United States by an informant and that this act was not illegal because it was done on behalf of the United States. Therefore, according to Moreno, even if she aided and abetted the importation she committed no crime. We rejected this argument in *Haynes v. United States*, 319 F.2d 620 (5th Cir.1963) in which we held that a defendant who arranged to have a controlled substance brought into the United States by a government agent could be convicted for importing that substance. This argument is, therefore, without merit.

■ Alternatively, Moreno argues that even if the importation was illegal, that the evidence was insufficient to prove that she aided and abetted that importation. Moreno contends that she may be convicted for aiding and abetting only if she provided critical or substantial assistance to the government agent and that her actions did not rise to this level. Specifically, she notes that she neither provided the cocaine to the informant nor helped to bring it ashore in the United States. Consequently, she argues, the jury could not have found that she was an active participant in the importation or that she willfully caused the informant to act in her stead. We do not agree.

The evidence established that Moreno and other individuals met with the informant in Columbia and arranged for the informant to bring the cocaine into the United States. The parties agreed that the informant would deliver the cocaine to Moreno in the United States and that Moreno would pay the informant for his services. Moreno, in fact, made a partial payment and arranged to make full payment at a later time. At the time of Moreno's arrest the police found in her apartment a slip of paper with the name of the informant's ship and a telephone number for the ship's broker. It is true that Moreno did not herself deliver the cocaine to the informant or off load it in the United States. Nonetheless, the jury could have found, given these facts, that Moreno willfully caused the informant to act in her behalf. We, therefore, affirm Moreno's conviction for importing cocaine.

### C. *Sufficiency of the Evidence—Orguiza*

■ Like Moreno, Orguiza argues that the evidence was insufficient to sustain his conviction. Orguiza's contention, however, fares better than did Moreno's. Orguiza was convicted of conspiracy to possess cocaine with the intent to distribute it. The government's case against Orguiza consists of the following facts:

1. Beltran was originally given a telephone number to contact "Justo" in the United States.
2. Orguiza's first name is Justiniano.
3. The government taped an incriminating conversation with an individual who identified himself as "Justo" but who was *not* identified as Orguiza.
4. Orguiza was seen in the company of the other defendants on the day of the arrest.
5. Orguiza had the keys to Moreno's apartment.
6. In Moreno's apartment the police found a city of Houston water receipt made out to Orguiza listing an address that corresponded to the telephone number for "Justo" given to Beltran.

Facts four and five are insufficient to prove that Orguiza conspired to possess cocaine. As we stated in *United States v. Gomez*, 776 F.2d 542, 549 (5th Cir.1985), "defendant may not be convicted merely on a showing that he associated with individuals participating in a conspiracy, or by evidence that merely places him in a "climate of activity that reeks of something foul...." Facts number one, two and three could have provided support for the government's case if the government had presented evidence that Orguiza's nickname was "Justo" or that the person to whom they spoke on the telephone was Orguiza. The government, however, presented no evidence on either issue. The remaining fact, number six, indicates that at some time Orguiza probably lived at the telephone number given to Beltran in Columbia. Viewing the totality of the evidence in the light most favorable to the prosecution, we conclude, however, that no reasonable trier of fact could have found, beyond a reasonable doubt, that Orguiza conspired to possess cocaine. We, therefore, reverse Orguiza's conviction.

### D. *Use of Prior Convictions—Ruiz*

Ruiz contends that the trial court's failure to make an on the record finding that the probative value of using his prior convictions for impeachment purposes outweighed its prejudicial effects constituted reversible error. Alternatively, he contends that the probative value of the evidence was outweighed by its prejudicial effect. In *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (en banc) *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), we held that a court must engage in a two step balancing test prior to admitting extrinsic evidence of prior bad acts. *Id.* at 911. Under this test: "[F]irst it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice...." *Id.* at 911. In *United States v. Robinson*, 700 F.2d 205 (5th Cir.1983) we held that "... the intendment and purpose of the prejudice element in [the use of evidence of extrinsic prior bad acts] ... are [sufficient] ... to warrant ... an on-the-record articulation by the trial court of *Beechum's* probative value/prejudice inquiry when requested by a party." *Id.* at 213. We further held that "[i]n the absence of on-the-record findings in response to such a request, we will be obliged to remand unless the factors upon which the probative value/prejudice evaluation were made are readily apparent from the record and there is no substantial uncertainty about the correctness of the ruling." *Id.* at 213. *See also United States v. Zabaneh*, 837 F.2d 1249 (5th Cir.1988).

In this case Ruiz elected to take the stand in his own defense. Anticipating that the government would attempt to impeach Ruiz by use of his prior convictions, his attorney stated, "... I would like, on the record, balancing the prior convictions in that they are identical to the same offense charged and I would argue that they would be unduly prejudicial...." A brief conversation ensued between the court, the prosecutor, and Ruiz's attorney, regarding the nature and dates of the prior offenses. The court then stated, "That motion is denied." Ruiz took the stand and, on cross-examination, testified that he was uncertain that he would recognize cocaine if he saw it. The government then used the

evidence of Ruiz's prior convictions to impeach him. The court gave the jury a limiting instruction to the effect that this evidence could be used for impeachment purposes only.

From the record in this case, it is apparent that the court's ruling allowing evidence of prior convictions was correct, as his prior convictions show his knowledge of the substance in which he was dealing. *See, e.g., United States v. Rodarte,* 596 F.2d 141 (5th Cir.1979). The factors upon which the probative value/prejudice evaluation were made, however, are not clear from the record. We, therefore, remand this case to allow the district court to make an on-the-record evaluation of these factors. We note, in doing so, that there are occasions such as this one in which the probative value of the evidence is not readily apparent until the defendant testifies. In such circumstances the trial court may make its evaluation based on the likely uses of such evidence and condition its use based on the defendant's testimony.

The district court's judgment as to Moreno is AFFIRMED;

the judgment as to Orguiza is REVERSED;

and the judgment as to Ruiz is VACATED and REMANDED.