**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Cynthia Diane ROBERTS, Johnny Binder, Jr., and Martha Marie Preston,**
**Defendants–Appellants.**

No. 88–6185.

United States Court of Appeals,
Fifth Circuit.

Sept. 19, 1990.

212

David Cunningham, Houston, Tex., (Court-appointed), for Roberts.

Kent A. Schaffer, Houston, Tex., for Binder.

Will Gray, David R. Bires, Houston, Tex., for Preston.

Mel R. Pechacek, Paula C. Offenhauser, Asst. U.S. Attys., Gulf Coast Drug Task Force, Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before GEE, RUBIN, and DAVIS, Circuit Judges.

GEE, Circuit Judge:

Today we decide—among other points of error—whether the government's use of four peremptory strikes to exclude black veniremembers violated the defendants' constitutional rights under *Batson v. Ken-*

*tucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and whether an ex parte communication between the district court's case manager and the jury violated the defendants' fifth and sixth amendment rights. We find no reversible error by the district court and therefore affirm their convictions.

Appellants Cynthia Diane Roberts, Johnny Binder, Jr., and Martha Marie Preston appeal their convictions for aiding and abetting the distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Defendant Binder also challenges his conviction for aiding and abetting the maintenance of a place for the purpose of manufacturing "crack" cocaine in violation of 21 U.S.C. § 856—the "crackhouse law." The three defendants jointly allege that the district court erred in denying their *Batson* motion—a motion challenging the government's use of peremptory strikes to exclude black veniremembers—and allege that an ex parte communication between the district court's case manager and the jury violated their constitutional rights under the Fifth and Sixth Amendments. Preston and Binder challenge the sufficiency of the evidence supporting their aiding and abetting convictions. We find nothing in the record supporting any of the defendants' points of error and therefore affirm.

### Facts and Procedural History

The government indicted Roberts, Preston, Binder and twenty-five others for conspiracy to possess cocaine with intent to distribute (in both crack form and as a powder base) in violation of 21 U.S.C. § 846 and § 841(a)(1). Preston and Binder, the two lead defendants in the case, were separately indicted for engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848; for maintaining a facility for the manufacture and distribution of "crack" cocaine in violation of 21 U.S.C. § 856; for aiding and abetting the possession of cocaine with intent to distribute; and for aiding and abetting the distribution of cocaine. Preston was separately indicted for the use of a communication facility in viola-

tion of 21 U.S.C. § 843(b) and for attempting to influence a government witness in violation of 18 U.S.C. § 1512. Binder was separately indicted for conspiracy to defraud the United States Government in violation of 18 U.S.C. § 371 and for witness tampering in violation of 18 U.S.C. § 1512. The indictments resulted from an intensive four year undercover investigation into a Houston cocaine trafficking network, an investigation which led to a series of Houston Police Department and Drug Enforcement Agency ("DEA") controlled buys of cocaine and to raids on Houston nightclubs and other establishments suspected of operating as crackhouses.[1]

All three appellants pled not guilty and were tried before a jury. The jury found Roberts guilty on one count of aiding and abetting the distribution of cocaine on or about December 17, 1986 and acquitted her of the remaining charges. The district court sentenced her to four years in the custody of the Attorney General and three years special parole, with the condition that she be placed in the prison closest to Houston having a drug treatment facility.

The jury found Preston guilty of aiding and abetting the distribution of cocaine on or about February 2 and on February 25, 1987, and of witness tampering. The court sentenced her to twenty years in the custody of the Attorney General, three years special parole and imposed a $60,000 fine for each count of aiding and abetting, with the sentences to run consecutively. The court further sentenced her to twenty-one months incarceration, two years supervised release and assessed a $20,000 fine for the witness tampering count, to run concurrently with the aiding and abetting sentences.

The jury convicted Binder of aiding and abetting the distribution of cocaine on or about December 17, 1986 and of aiding and abetting the maintenance of a place for the purpose of manufacturing, distributing and using "crack" cocaine on May 23, 1987, at 8515 Hearth Street, acquitting him of the remaining counts. The district court sentenced him to twenty years in the custody

---

1. A "crackhouse" is a place where crack cocaine is manufactured, distributed, or sold.

of the Attorney General, three years special parole, and imposed a $100,000 fine on each count, with the sentences to run consecutively. From these convictions, the defendants appeal.

### The Batson Challenge

The three defendants, each of whom is black, contend that the government violated their Fifth Amendment rights by using its peremptory challenges to exclude blacks from the jury in the manner condemned by *Batson v. Kentucky*. Each defendant made timely objections to the prosecution's peremptory strikes of four black veniremembers. The government eventually used four of its seven peremptory strikes to exclude blacks from the jury. The government used the remaining three challenges to exclude non-blacks. Two blacks were ultimately selected as members of the jury.

■    To prevail on a *Batson* claim, defendant must allege a prima facie case of discrimination. To meet this burden, the defendant must show that he is a member of a cognizable racial group and that the prosecutor exercised peremptory challenges to remove from the venire members of his race. *Batson*, 476 U.S. 79 at 95, 106 S.Ct. 1712 at 1722. The prosecution denied any systematic exclusion of blacks, noting the presence of two black women on the jury.[2] The district court ruled, however, that the defendants had established a prima facie *Batson* case.

■    Once a defendant establishes a prima facie *Batson* case, the burden shifts to the prosecution to offer a race neutral explanation for striking the black veniremembers. *Batson*, 476 U.S. 79 at 96, 106 S.Ct. 1712 at 1722–23; *United States v. Moreno*, 878 F.2d 817, 820 (5th Cir.1989). Such an explanation need not rise to the level justifying exercise of a challenge for cause, but need only give a "clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." *United States v. Romero–Reyna*, 867 F.2d 834, 837 (5th Cir.1989), *aff'd on*

*remand*, 889 F.2d 559 (5th Cir.1989). Here, the district court conducted a formal hearing on the defendants' *Batson* motion and found the government's explanations sufficient to uphold the peremptory strikes.

■    The issues presented in a *Batson* motion primarily turn on evaluations of credibility and therefore we review the district court's finding that the government committed no *Batson* error under a clearly erroneous standard. *See United States v. Terrazas–Carrasco*, 861 F.2d 93, 94 (5th Cir.1988). Giving proper deference to the district court's decision, we conclude that the defendants' *Batson* challenge is without merit. Unlike the jury in *Batson*, the jury here ultimately held two black jurors. Moreover, our review of the record discloses a sufficient basis for the government's peremptory challenges of the three black veniremembers and the one black alternate veniremember excluded from the jury.

■■    The prosecution struck juror number eight, a black woman, because of her disinterested demeanor, her inattentiveness, and her reluctance to serve on a jury because she worked nights and was responsible for the care of her small grandchild during the day. Intuitive assumptions about a potential juror's interest and attitudes can be acceptable as a neutral explanation for a peremptory challenge. *See United States v. Moreno*, 878 F.2d 817, 821 (5th Cir.1989). Here, the district court found a neutral basis in the government's explanation and we do not disturb its ruling.

■    The prosecution excluded juror number eleven, a black woman, because of her involvement in the political campaigns of Anthony Hall and of the late Mickey Leland and her statement that she was inclined to believe representations made to her by persons whose political candidacy she supported. The defendants listed Mr. Hall as a potential defense witness. Juror eleven also had been exposed to pre-trial publicity concerning the case. The district court found that these explanations offered

2.  The prosecution also noted that one of the    prosecutors in the case, John Kyles, is black.

sufficient justification for her exclusion from the jury and so do we.

■ Juror number fourteen, a black man, stated during voir dire that he would not consider tape recordings as evidence in a criminal case, even though they were lawfully obtained, because such evidence violated a defendant's "rights." Senator Craig Washington, counsel for one of the defendants, questioned juror fourteen during a sidebar conference and the juror recanted, agreeing with every statement made by Senator Washington regarding tape recorded evidence. The government maintains that this shift in view was insincere because the juror was in awe of Senator Washington and answered the sidebar questions in a submissive deference to the senator. We agree with the district court that the government could reasonably question this juror's ability to view the evidence presented impartially and find no *Batson* violation.

■ The government struck a prospective alternate juror, number thirty-six, a black woman, because she knew defendant Cynthia Roberts and had heard her sing at a local club. The government maintains that it feared that this juror would identify with the defense because of her earlier knowledge of a defendant and of her familiarity with Robert's singing career. Part of Binder's anticipated defense to the continuing criminal enterprise count was that he was a legitimate recording contractor and that defendant Roberts was his legitimate client. Knowledge of and familiarity with a named defendant in the case is a neutral basis upon which the government may exercise a peremptory strike.

We note that the court accepted these explanations only after extensive cross-examination of the prosecutor and argument by defense counsel. The jury ultimately contained two blacks, and the government's three remaining peremptory challenges excluded people of races different than that of the defendants. The district court's conclusion that none of the government's challenges disqualified any potential juror because of his race is supported by the record and is therefore not clearly erroneous.

### The Ex Parte Communication

■ The three defendants next allege error at their trial as a result of the district court case manager's communication to the jury during its deliberations. The communication at issue involved an inquiry from a juror to the case manager as to whether the jury would deliberate on a Saturday. The jury began its deliberations on a Monday and the court initially advised the jury that it could "go within reason as long as it wanted to." With regard to weekend deliberations, the court told defense counsel at the beginning of the week that the choice would remain with the jury. On Tuesday, however, the court notified defense counsel that the jury would deliberate on Saturday if the deliberations were to last that long.

Two days later, on Thursday afternoon, the court's case manager went into the jury room to inquire about scheduling matters. On Friday morning defense counsel objected to the case manager's ex parte communication, contending that the effect of her inquiry could "possibly have some sort of subtle coercion toward a verdict." The court conducted a hearing at the request of the defendants, inquiring as to what had transpired between the case manager and the jury. The case manager's testimony reveals that several of the jurors asked whether they would deliberate on a Saturday and that the case manager advised them that the court had not yet decided. The case manager said nothing further to the jury other than "have a nice evening." The court directed that all further scheduling inquiries by the jury be made in open court. On Friday evening, the jury informed the court that they were breaking for the evening and again had a question as to the schedule. In open court, the court informed the jury that they should return on Saturday morning and continue their deliberations.

The deliberations continued for an additional five days before the jury returned its final verdict. The court instructed the attorneys in the case not to "approach any

juror or to discuss anything with any juror without getting prior leave of court." Defense counsel made no objection. Later, defense counsel filed a written motion to communicate with jury to discover any misconduct that could warrant a new trial. The district court denied the motion.

The defendants now contend that the district court allowed an improper ex parte communication between the case manager and the jury and that the court failed to conduct a proper hearing to ensure that the jury was not prejudiced as a result of this communication. The defense made no objection at trial to the clerk's communication with the jury as violating the defendants' Sixth Amendment rights to be present at a critical stage of the proceedings, nor did they object at trial on the basis of Federal Rule of Criminal Procedure 43(a).[3] Consequently, our review of these claims is limited to a determination whether the record shows plain error. *United States v. Martinez,* 604 F.2d 361, 365 (5th Cir.1979).

The procedures used to investigate allegations of juror misconduct and the decision as to whether to hold an evidentiary hearing are matters which rest solely within the sound discretion of the district court. *United States v. Phillips,* 664 F.2d 971, 998–99 (5th Cir.1981). The defendants here liken the case manager's ex parte communication to the one in *United States v. Gypsum,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). In *Gypsum,* the district court received reports of tension among the jurors and in response issued a modified *Allen* charge[4] and shortened the hours of deliberation. The district judge then met with the foreman of the jury, without the presence of counsel, "to discuss the condition of the Jury and further guidance." The discussion contained several references to the jury's deadlock and the foreman was left with the impression that the judge wanted a verdict "one way or the other." The Supreme Court held that this ex parte communication established reversible error because the "discussion was inadvertently allowed to drift into what amounted to a supplemental instruction to the foreman relating the jury's obligation to return a verdict ... [and] counsel were denied any chance to correct whatever mistaken impression the foreman might have taken from [the] conversation." *Gypsum,* 438 U.S. 422 at 462, 98 S.Ct. 2864 at 2886.

The case before us today illustrates the "pitfalls inherent" in any form of ex parte communication that "even an experienced trial judge cannot be certain to avoid." *Gypsum,* 438 U.S. 422 at 460, 98 S.Ct. 2864 at 2885. We heed the caveat of the Supreme Court, however, that an ex parte communication alone does not constitute reversible error. *Gypsum,* 438 U.S. 422 at 462, 98 S.Ct. 2864 at 2886. Here we conclude that reversible error did not occur. A private exchange with the case manager here was less likely to act as an instructive or coercive force on the jury than was the private conversation with the trial judge which occurred in *Gypsum.* Here, the case manager's conversation with the jury did not drift "into what amounted to a supplemental instruction to the foreman"; rather, the jury remained afloat with no answers from the court even as to the collateral question of whether they would have Saturday off. Moreover, the defense counsel here were not denied the chance to correct any mistaken impression. The jury continued its deliberations for an additional six days after the case manager's communication—evidence itself indicating that the

---

**3.** Fed.R.Cr.Proc. 43(a) provides: "The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule." For the reasons given in response to the defendants' Sixth Amendment argument, we conclude that any violation of Rule 43(a) was harmless error. *See Rogers v. United States,* 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1, 6 (1975) ("a

violation of Rule 43 may in some circumstances be harmless error"); Fed.R.Cr.Proc. 52(a) (any error which does not affect substantial rights shall be disregarded).

**4.** An *Allen* charge instructs the jury "to deliberate with a view toward reaching agreement if you can, without violence, to individual judgment." *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

communication was not coercive in nature—and thus the defense had ample time to request that the jury be further instructed to correct any mistaken impression left by their fleeting encounter with the case manager.

### Sufficiency of the Evidence—Preston

Preston separately contends that the evidence at trial was insufficient to sustain her convictions for aiding and abetting the distribution of cocaine on February 2, 1987 and February 25, 1987. The standard of review for claims of sufficiency of the evidence is whether, after viewing the evidence presented and all inferences that may reasonably be drawn from it in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Lechuga*, 888 F.2d 1472, 1476 (5th Cir.1989). We review the record resolving all inferences and credibility determinations in a light most favorable to the jury's verdict. *Lechuga*, 888 F.2d at 1476.

The government must prove that a defendant (1) knowingly (2) distributed (3) cocaine to sustain a conviction for illegal distribution. *Id.* at 1478. To prove the aiding and abetting of cocaine distribution, the government must show that (1) the defendant associated in the criminal venture, (2) participated in the venture, and (3) sought by action to make the venture succeed. *United States v. Casto*, 889 F.2d 562, 565 (5th Cir.1989). We conclude that the evidence is sufficient to convict Preston of aiding and abetting the distribution of cocaine on both counts.

The facts giving rise to the two charges are as follows: Undercover DEA Agent Charlie Boyce met with co-defendant Roy Brock (a suspected cocaine dealer) and confidential informant John Hicks at the Myosha Club, a Houston nightclub owned by Preston on January 27, 1987, to arrange for an introduction to Preston in the hopes of purchasing eight ounces of cocaine from her. Later in the evening, Agent Boyce observed Preston record Brock's telephone number on a slip of paper and hand the slip to Mr. Hicks along with a one hundred dollar bill.

The next meeting occurred on February 2. Brock informed Agent Boyce that the "ounces were coming" and that it was "good stuff." Agent Boyce suggested that in the future they eliminate Mr. Hicks as the middleman and Brock agreed. For this transaction, however, Mr. Hicks acted as middleman and delivered the requested cocaine to Agent Boyce and gave $8,800 to Brock.

Agent Boyce contacted Preston directly on February 23, 1987, via recorded telephone conversation. In that conversation, Agent Boyce advised Preston that the February 2, 1987 delivery was two ounces short. Preston agreed to meet with Agent Boyce and Brock, but did not show. Agent Boyce made another telephone call to Preston—also recorded—on February 25, 1987. In this taped conversation, Preston admitted to supplying the six ounces of cocaine on February 2 and agreed to supply an additional two ounces. Later that day, Agent Boyce met with Preston and she explained to Agent Boyce that "her organization was capable of supplying multi-kilo quantities of cocaine" on a regular basis and that Brock would meet with him at Intercontinental Airport to deliver the additional two ounces. Brock delivered the cocaine to Agent Boyce at the airport and the agent paid him $2200. Agent Boyce continued his contact with Preston and Brock after February 25, arranging additional orders of cocaine and requesting lessons in converting the cocaine he purchased into "rock" form.

Preston contends that these facts are insufficient to sustain her aiding and abetting convictions, particularly the February 2 conviction, because Agent Boyce never dealt directly with her. We disagree. In her telephone conversation with Agent Brock on February 25th, Preston undeniably admits her participation in the February 2 distribution, saying that informant Hicks only ordered six ounces from her. In the same conversation, she unequivocal-

ly arranges for the distribution of two additional ounces of cocaine. Our review of the record leaves us in no doubt that Preston intentionally assisted the distribution of cocaine on both occasions and was guilty as charged.

### Sufficiency of the Evidence—Binder

Binder challenges the sufficiency of the evidence to convict him of aiding and abetting the distribution of cocaine on December 17, 1986. Binder's conviction results from the undercover work of DEA Agent Anna Saulnier and confidential informant David Johnson. On December 12, 1986, the DEA wired informant Johnson with a KELL recorder to establish surveillance of activities at the Myosha nightclub. He met with Preston and agreed to return the following Monday. Mr. Johnson met with Preston on two subsequent occasions, with Preston again instructing him to return at a later date. At 2:30 p.m. on December 17, Mr. Johnson introduced Agent Saulnier to Preston. Preston told Mr. Johnson that he should return later that evening and that she would arrange for Binder to make a cocaine sale. She herself would not make the sale because of three recent police raids.

At 8:30 that evening, Agent Saulnier and Mr. Johnson returned to the Myosha club and awaited Binder's arrival. Binder arrived at 10:30 p.m. and sent a male companion of his over to Agent Saulnier. The man—later identified as Steve Culotta— told the agent that it had been suggested that they go outside the club and that he keep her company. Mr. Johnson and Binder then retired to a private room of the club and at Mr. Johnson's request, Agent Salnier gave him the $2400 required to purchase two ounces of cocaine. Agent Saulnier began to worry when Mr. Johnson did not rejoin them outside and returned to the club. Agent Saulnier observed Binder, Roberts, co-defendant Brenda Saxon, and several others in conversation with Mr. Johnson. At her suggestion that they

leave, Mr. Johnson informed her that they were going to get the cocaine. Binder then ordered Roberts and Saxon to "take them to Denny's."

Agent Saulnier followed Roberts, Saxon and Johnson, who rode in a Chevy Blazer owned by Binder, to a Denny's restaurant to await delivery of the cocaine. At the request of a male child about twelve years old, Agent Saulnier went outside Denny's to move her car. Upon her return, Roberts told her that the cocaine had arrived and the group went outside. At the same time, surveillance officers observed a dark colored limousine, similar to one used by Binder earlier in the evening, pull up next to the Blazer in the Denny's parking lot.[5] The limousine departed and, less than three minutes later, the surveillance officers saw Saxon reach down and pull a package of cocaine from underneath the tire or tire well of the Blazer and hand it to Roberts. Roberts, in turn, gave the cocaine to Agent Saulnier and Mr. Johnson.

Binder contends that none of this evidence proves he aided and abetted the delivery of the cocaine. We conclude that a reasonable jury could find from this evidence that Binder did aid in the December 17th distribution at Denny's. Binder asserts that his mere presence at the Myosha club meeting is insufficient to demonstrate that he aided Saxon and Roberts in the distribution of the cocaine. We agree that his mere presence is insufficient to convict him, but are mindful that neither we nor the jury are required to examine each circumstance surrounding the conviction in isolation. "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." *Lechuga*, 888 F.2d 1472 at 1476. Here Binder ordered his associates to take Agent Saulnier to the place where the final delivery of cocaine occurred, Roberts removed the cocaine from a tire well of a truck Binder owned, and police ob-

---

**5.** The surveillance officers could not identify the occupants of the limousine because the limou-sine's windows were tinted.

served a black limousine by the truck just before the delivery—one similar to the one Binder arrived in at the Myosha club earlier that evening. A rational jury could infer beyond a reasonable doubt from these circumstances in addition to Binder's presence that the cocaine negotiations were arranged, controlled, and supervised by Binder; and we find no error in his conviction.

### The "Crackhouse Law" Conviction—Binder

■ The jury also convicted Binder of aiding and abetting the offense described in 21 U.S.C. § 856(a)(1)—the crackhouse statute. To sustain a conviction for this offense, the government must prove that the defendant (1) intentionally and knowingly (2) opened or maintained a place (3) for the purpose of using, manufacturing or distributing a controlled substance. *United States v. Onick*, 889 F.2d 1425, 1431 (5th Cir.1989). Binder contends that the government's evidence is insufficient to convict him under § 856(a)(1) and further asserts that the district court incorrectly charged the jury on the "purpose" element required by § 856(a)(1).

Binder's conviction arose from a Houston Police and DEA raid on May 23, 1987 on a condominium located at 8515 Hearth street. Roberts and Binder leased the condominium pursuant to a verbal agreement, and Binder paid most of the rents for it. The DEA discovered the possibility that the Hearth street condominium was a location for manufacturing crack through its communication with Cassandra Parker. Ms. Parker was pursuing a music career, and Binder was introduced to her as someone who could manage her career. Ms. Parker signed a management contract with Binder, and agreed to sing with defendant Roberts. Ms. Parker was originally unaware of Binder's cocaine trafficking activities. Three months later, however, Ms. Parker approached the DEA and informed them that Binder was not a legitimate music manager but rather a drug dealer. Ms. Parker continued to work for Binder and observed a number of suspicious activities over the next several weeks. Binder asked Ms. Parker if she would move into the Hearth condominium so that he could use her apartment to "get his business straight." Roberts told Ms. Parker that Binder probably wanted to use the apartment "to cook and probably store stuff in." After conferring with the Houston Police, Parker refused Binder's request and subsequently became a paid DEA informant.

In early May of 1987, Ms. Parker visited the Hearth location where three individuals showed her a suitcase containing drug paraphernalia and the general supplies needed for converting cocaine to crack form. Ms. Parker observed Roberts converting the cocaine, during which time Binder arrived and told her that he did not want her there. Before she left, Ms. Parker watched Binder in the bedroom with a large mirror on the floor, cutting the "crack" with a razor blade.[6]

Confidential informant Keith Davis told the DEA that Binder had cooked cocaine and planned to distribute it on May 23rd. On that day, DEA surveillance watched Binder meet several suspected drug dealers and later that evening continued their watch at the Hearth street condominium. DEA agents saw Binder's Mercedes Benz parked under the carport. The agents quietly arrested lookout Danny Jackson and approached the condominium with the assistance of the building's security guard. As the agents knocked on the door, they heard Binder ordering Roberts to get dressed and the noise of toilets flushing several times. Upon entry, Officer Steven Kwiatkowski recovered numerous small baggies of cocaine found flushing in the toilet. After obtaining a valid search warrant, the agents found two white envelopes containing thirty-two packs of crack cocaine, equipment required for the manufacture and packaging of crack cocaine[7], for-

---

**6.** Ms. Parker attempted to reach DEA agents immediately but was unsuccessful. She did scrape crack particles off of the mirror and delivered them to the Houston Police on May 13th.

**7.** The equipment included: two glass test tubes with cocaine residue in them, two triple beam

ty-one white envelopes containing particles of crack cocaine, and crack cocaine stored in a laundry bag in the bathroom.[8]

DEA agents posted outside the condominium meanwhile saw Binder climb down the balcony of the Hearth condominium, lower himself to the ground and run down the alley. Agents pursued him but lost sight of him. Police recovered Binder's cap from the ground underneath the balcony and his jogging suit jacket from the condominium.

■■■ Binder contends that this evidence is insufficient to convict him under § 856(a)(1). He asserts that the primary "purpose" of the Hearth street condominium was as Robert's residence and that Congress intended § 856 to apply only to facilities for which drug trafficking is the sole purpose and not one of several purposes. He contends that any other interpretation would mean that casual drug users risk felony conviction for drug use in their own homes.

Had Congress intended convictions under § 856 to be limited to those who open or maintain facilities having cocaine manufacturing as their sole purpose, it would have said so. Such a narrow construction as Binder suggests would eviscerate the statute, since it is highly unlikely that anyone would openly maintain a place for the purpose of manufacturing and distributing cocaine without some sort of "legitimate" cover—as a residence, a nightclub, a retail business, or a storage barn. Here, Binder was scarcely a "casual" user of cocaine. The quantity of cocaine and manufacturing equipment recovered from the condominium, together with Ms. Parker's testimony, demonstrate that a primary purpose for renting the Hearth location was to manufacture and distribute cocaine.

■■■ The defense requested a jury instruction regarding the "purpose" element of § 856—an instruction which tracked the language of the statute but inserted the word "primary" before "purpose."[9] We find no error in the district court's denying such an instruction because its language was superfluous and would serve only to confuse the jury. Section 856 states that it is an offense to maintain a place for "the purpose" of manufacturing or distributing cocaine. The meaning of that phrase lies within the common understanding of jurors and needs no further elaboration. *See United States v. Beasley*, 519 F.2d 233 (5th Cir.1975), vacated on other grounds, 425 U.S. 956, 96 S.Ct. 1736, 48 L.Ed.2d 201 (1976).

Binder further challenges the sufficiency of the evidence on the ground that he did not "open or maintain" the place as § 856 requires. He cites *United States v. Onick*, 889 F.2d 1425, 1429 (5th Cir.1989) to support his contention. That case is factually distinguishable from the case before us today. In *Onick*, we reversed a conviction for possession of illegal drugs with intent to distribute under 21 U.S.C. § 841(a)(1) because the only evidence linking one defendant to the crime was her presence when the police searched the house. We concluded that the evidence was insufficient to convict that defendant of constructive possession of the drugs. In the same case, however, we concluded that another defendant was guilty of possession of the

scales, three boxes of baking soda, three bottles of rubbing alcohol, one bag of king size cotton balls, razor blades, cotton tipped wires, and clear plastic bags. Police found all of this equipment in one large suitcase in the storage shed on the terrace of the apartment.

8. Police also recovered written notations documenting sales of crack from the condominium, as well as from Binder's Mercedes.

9. The requested instruction read: "You are instructed to look to the nature and character of the location in question to determine its primary purpose. In order for you to return a verdict of guilty as to this count, you must find that the main or primary purpose for the purpose [sic] for the opening or maintaining of the location was for the use, manufacturing, or distribution of a controlled substance. On the other hand, should you find that the location was not used for the manufacturing, use or distribution of a controlled substance, you must find the defendant not guilty. If you find that the primary purpose for the opening or maintain [sic] the location was other than the use, manufacture and distribution of a controlled substance, then you must acquit the defendant's [sic] and say by your verdict of not guilty."

drugs when the evidence indicated that he exercised dominion and control over the house.[10] *Onick,* 889 F.2d 1425 at 1430.

Here we conclude that Binder did exercise sufficient dominion and control. He paid most of the rent on the condominium. He attempted to arrange a swap with Ms. Parker to trade the Hearth condominium for her apartment for a period of time. Police found him in residence the day of the search and heard him issuing orders to the condominium's occupants. His jacket was found inside the condominium and his cap on the ground just outside. Ms. Parker had observed Binder cutting cocaine in the condominium on one occassion prior to the police raid. We find the evidence sufficient to prove that he aided and abetted the maintenance of the Hearth condominium.

The government, in its litany of responses to Binder's motion to suppress the evidence gathered by the police at the Hearth location, added a single statement that Binder lacked standing to contest the search. The district court summarily denied all of the defendants' motions to suppress—save one unrelated to the Hearth location—and Binder now asserts that the government's standing argument recognizes Binder's lack of control over the Hearth location. We are unpersuaded. District courts should offer reasons for their decisions, but when a search warrant is not seriously contested by the defense and several grounds exist for denying a motion to suppress a transparently valid search warrant—as is the case here—the defendant may not seize on a non-essential response to create an inconsistency in the government's case. Moreover, the jury convicted Binder of aiding and abetting the substantive offense described in § 856. It is not apparent to us that a prosecutor creates a conflict by alleging that a defendant lacks standing to contest the search of a location even while charging that he furthers the activities conducted at that location.

10. The evidence included papers belonging to the defendant, the defendant's clothes and re-

*Conclusion*

We conclude that the defendants have failed to demonstrate that reversible error occurred at their trial. Therefore, for the reasons set forth in our opinion today, their convictions are

AFFIRMED.

ceipts written to the defendant at that address.