**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ricky VALLEY, Defendant–Appellant.**

No. 89–4921.

United States Court of Appeals,
Fifth Circuit.

March 21, 1991.

**131**

Ricky Valley, Houston, Tex., defendant-appellant, pro se.

Brian Wice and Richard Frankoff, Houston, Tex., for defendant-appellant.

O. Kenneth Dodd, Asst. U.S. Atty., and Bob Wortham, U.S. Atty., Beaumont, Tex., for plaintiff-appellee.

Before WISDOM, JOLLY, and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The appellant, Ricky Valley ("Valley"), was the central figure in an ongoing conspiracy to steal and forge endorsements of Social Security checks. He appeals his convictions on one count of conspiracy to commit theft and receive stolen mail in order to forge endorsements on Treasury bonds or checks, and multiple counts of aiding and abetting in the possession and forgery of Treasury checks with the intent to defraud. Specifically, Valley argues that the district court improperly allowed the prosecutor to introduce the guilty pleas of his co-conspirators at his trial. Furthermore, he argues that during his closing argument to the jury, the prosecutor improperly made reference to Valley's refusal to testify. Finally, he argues that the prosecutor improperly exercised his peremptory challenges to strike several black jurors from the jury venire in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). For the reasons discussed below, we affirm.

I

The evidence of Valley's guilt is substantial. Co-conspirators Elton Lee, Jr., Mark Ina, Susie Thompson, and Tami Ina all testified to the same basic story: The conspiracy began in 1980 when Valley asked them to sign and cash stolen checks. The conspirators would go to Beaumont, Port Arthur, Ft. Worth, and Austin to steal checks from mail trucks and would sometimes stay overnight in these cities. Valley, who had been previously employed by the United States Postal Service, had a postal uniform as well as a set of postal keys that he utilized in connection with burglarizing mail trucks to obtain checks. After obtaining the checks, the conspirators would go to a motel where Valley would create fake identification to enable the co-conspirators to pass the checks at various stores.

Valley was the ring leader. He was in charge of passing out the stolen checks to the co-conspirator he believed would be

most successful at passing the check. He was also the one who would drive the co-conspirators to different stores to cash the checks. In return for passing the checks, the co-conspirators were given a percentage of the cash. Each co-conspirator testified that Valley was in charge of deciding who received what sum of money for their efforts. Finally, over defense counsel's objection, each co-conspirator testified that he or she had earlier entered a guilty plea in connection with this case and was awaiting sentencing.

A paper trail also linked Valley to the crimes. Susie Thompson testified that she forged and cashed a stolen check belonging to Dolly Casteel. Thompson testified that she cashed the stolen and forged check at a Piggly Wiggly in Orange, Texas, in 1983. Sandra Duhon, an employee of the store, testified that Thompson cashed the stolen check in exchange for a money order in the amount of $59.44. David Kahoot, the custodian of records for Citycorp Acceptance Company, testified that his records reflected that the ledger card for a loan for Selena Valley evidenced a payment on that loan in November of 1983 in the amount of a $59.44 money order.

In addition, numerous people testified that their Social Security checks had been stolen and their signatures forged. All the victims testified that they did not authorize the endorsement of their checks. Furthermore, several Special Agents with the United States Secret Service testified that the co-conspirators, Susie Thompson, Mark Ina, and Elton Lee, had each endorsed a number of stolen or missing Social Security checks. A Secret Service fingerprint analyst also testified that the fingerprints of Thompson, Ina, and Lee were present on a number of the stolen United States Treasury checks. Finally, Nita Lyons, owner of a laminating service in Houston, testified further that Valley bought laminating supplies from her over a period of several years.

## II

Valley was indicted on one count of conspiracy to commit theft and to receive stolen mail in order to forge endorsements on Treasury bonds or checks under 18 U.S.C. § 371; and on 18 counts consisting of aiding and abetting in the forgery of writings under 18 U.S.C. §§ 2 and 495; aiding and abetting in the forgery of Treasury checks with intent to defraud under 18 U.S.C. §§ 2 and 510; and aiding and abetting in the possession of stolen mail under 18 U.S.C. §§ 2 and 1708. Trial to the jury was held in the United States District Court for the Eastern District of Texas.

Prior to trial, defense counsel, Mr. Androphy (hereinafter "defense counsel" or "Androphy"), filed a motion in limine asking the court to order the government "not to mention or allude to the pleas of guilty of any defendants or alleged co-conspirators." The trial court initially granted defense counsel's motion, although it reserved the right to reconsider its ruling depending on the evidence heard.

Subsequently, the government apprised the trial court of our holding in *United States v. Borchardt*, 698 F.2d 697 (5th Cir. 1983). On the day of trial, May 22, 1989, defense counsel, before the judge ruled on the government's opposition to the motion in limine, re-urged his objection and stated that it was not the defense strategy at that time to use the co-conspirators' guilty pleas. The court, nevertheless, reversed its ruling on the motion in limine and permitted the government to allude to the guilty pleas of the co-conspirators. The trial court indicated, however, that it would "give precautionary instructions which appear on page 36 of the Fifth Circuit Criminal Pattern Jury Instructions in connection with any such statement."

During the prosecutor's opening statement, defense counsel renewed his objection when the prosecutor alluded to the co-conspirators' guilty pleas. The trial court overruled the objection, but cautioned the jury that the "fact that the accomplice has entered a plea of guilty to the offense charged is not evidence in and of itself of the guilt of any other person, or of Ricky Valley." Similarly, defense counsel objected each time the prosecutor elicited the guilty pleas from the co-conspirators dur-

ing their direct examinations. Again, the court overruled the objections.

At the conclusion of the evidence, the trial court instructed the jury, *inter alia*, that the testimony of a co-defendant who has already pled guilty "is always to be received with caution and weighted with great care," and that "the fact that an accomplice has entered a plea of guilty to an offense is not evidence of the guilt of any other person." The jury found the appellant guilty on Counts 1–17, 20–21, and acquitted the appellant on Counts 22–27; the court dismissed Counts 12, 18–19, and 20–21. The court assessed punishment at fifteen years confinement and a fine of $76,000, followed by five years probation and restitution as to Count 1 in the amount of $5,085. Valley timely appeals.

### III

### A

██ "Our precedents have made it abundantly clear that evidence about the conviction of a co-conspirator is not admissible as substantive proof of the guilt of a defendant." *United States v. Handly,* 591 F.2d 1125, 1128 (5th Cir.1979). However, co-conspirator guilty pleas are admissible under a limited set of circumstances. The relevant factors in evaluating the impact of a witness' guilty plea are "the presence or absence of a limiting instruction, whether there was a proper purpose in introducing the fact of the guilty plea, whether the plea was improperly emphasized or used as substantive evidence of guilt, and whether the introduction of the plea was invited by defense counsel." *United States v. Black,* 685 F.2d 132, 135 (5th Cir.1982). More to the point here, we have held that a witness-accomplice's guilty plea may be brought out at trial provided that (1) the evidence serves a legitimate purpose and (2) the jury is properly instructed about the limited use that they may make of it. *Borchardt,* 698 F.2d at 701. *See United States v. Baete,* 414 F.2d 782, 784 (5th Cir.1969). In this case, it is conceded that the district court properly instructed the jury about the limited use of the guilty pleas. Consequently, we need only decide whether the prosecu-

tor had a legitimate reason for introducing them at trial.

██ In considering this question, we have recognized that a legitimate reason exists when the record reflects a defensive strategy to emphasize or rely on a co-conspirator's guilt. *Handly, supra.* As we explained in *Borchardt,* counsel presenting witnesses of blemished reputation routinely bring out "such adverse facts as they know will be developed on cross-examination" in order to avoid even the appearance of an "intent to conceal." 698 F.2d at 701 (*quoting United States v. Aronson,* 319 F.2d 48, 51 (2d Cir.1963)). Most recently, in *United States v. Leach,* 918 F.2d 464, 467 (5th Cir.1990), this court reaffirmed the "permissibility of 'blunt[ing] the sword' of anticipated impeachment by revealing the information first." (*quoting United States v. Marroquin,* 885 F.2d 1240, 1246 (5th Cir. 1989)).

Our opinion in *Handly* did not hold that countering a defense counsel's potential strategy was a *per se* legitimate reason. On the contrary, the court noted that in all such cases "[o]ur problem is determining ... whether [the] defense attorney would have commented on the guilty pleas absent the prosecutor's statements." 591 F.2d at 1128. The *Handly* court permitted the prosecutor's use of co-defendant guilty pleas because it found that "[t]here [was] no indication that defense counsel's emphasis on the guilty pleas was prompted by the prosecutor's remarks; the emphasis appears, instead, to have been independent of the impropriety of the prosecutor." *Id. See Borchardt, supra* (defense counsel indicated at the outset of the trial his intent to use felony convictions for impeachment purposes).

██ In our case, Androphy indicated on the record the possibility that he did not intend to use the guilty pleas at trial absent their use by the prosecutor. Specifically, he sought and initially obtained a motion in limine prohibiting the *government* from introducing the guilty pleas. The motion stated:

NOW COMES, RICKY VALLEY, Defendant herein, and respectfully moves this Court for an order instructing the United States Attorney, Agents and/or witnesses, not to mention or elude [sic] to the pleas of guilty of any defendants or alleged co-conspirators.

It is significant that Androphy's motion did not prohibit the *defendant* from bringing up the guilty pleas during opening statement or cross-examination as a means of attacking the co-conspirators' credibility. The government subsequently opposed this motion, apparently by arguing that *United States v. Borchardt, supra,* was applicable. Before the district court rescinded its earlier order, however, defense counsel stated for the record:

> [O]ur strategical position at this point in time is not to use those convictions [of the co-defendants], and for the record, it is our position now that we would not use them, but now that the Government's position has changed and the Court has permitted it, it may cause our strategy to change, and I want to stand [sic] for the record that we would not consider those as far as our initial strategical consideration in this case, and would not have used them on cross [examination].

Upon examination of the exact wording and circumstances surrounding Androphy's May 22, 1991 statement, we conclude that the district court did not abuse his discretion in allowing the government to allude to and introduce the co-conspirators' guilty pleas. The statement made to the district court is replete with qualifying language: "our strategical position *at this point in time* ..."; "it is our position *now* that we would not use them ..."; and "we would not consider those as far as our *initial* strategical considerations in this case...."

We are impressed by the fact that this statement was made just minutes before opening statements were to be made by each party. Even at this late stage in the proceedings, defense counsel was indicating that it was still considering using the guilty pleas at a later time, presumably during cross-examination. At no point did defense counsel state that if the government would not introduce the guilty pleas, neither would the defense.

█ Furthermore, the background against which the judge made his decision is relevant and justifies skepticism concerning Androphy's position. For example, on the morning of May 17, 1990, Androphy made this statement to the trial judge with respect to the motion in limine:

> As I recall, ... the other [motion] was not allowing *the government, until I decide my strategy,* to bring up the issue with regard to the convictions of the other alleged co-conspirators or co-defendants.

Permitting defense counsel to remain undecided until the last minute, i.e., cross-examination of the co-conspirator, would be unwarranted and unfair. Simply put, when defense counsel fails to make a timely unequivocal commitment not to raise the convictions of the co-defendants, the district court does not abuse its discretion in allowing the prosecution to first raise the subject before the jury.

Finally, in hindsight we might observe that the district court was justified in not embracing Androphy's statement. Androphy's trial strategy seems to have relied exclusively on attacking the credibility of the co-conspirators as his sole means of defense. No alternative strategy was used or offered. He did not put on any witnesses of his own and he refused to take the stand. As this was the strategy decided upon by defense counsel on the eve of trial, we are convinced that Androphy's use of qualifying language in the motion in limine and his statement to the district court was not inadvertent, a fact that was obvious to the district court.

Accordingly, we find that a legitimate purpose existed for the prosecutor's use of the guilty pleas. Furthermore, we note that the district court gave repeated limiting instructions informing the jury that the guilty pleas were not to be used as substantive evidence of Valley's guilt. We conclude that the district court did not abuse its discretion when it permitted the

government to introduce the co-conspirators' guilty pleas at trial.

## B

■ Valley also argues that the prosecutor improperly commented to the jury during his closing argument about Valley's refusal to testify. Specifically, the prosecutor stated:

> And then when it comes time for trial, they would have you believe that they are all lying. Mark Ina is lying, Elton Lee is lying, Susie Thompson, the mother of his [Valley's] child is lying, Tami Ina is lying. Everybody is lying, except Ricky Valley. But you haven't heard from Ricky Valley.

Defense counsel immediately objected, stating that the prosecutor "has commented on Mr. Valley's exercising of his Fifth Amendment rights...." The trial court sustained the objection, admonished the prosecutor, and instructed the jury to disregard the prosecutor's comments. Valley argues that this statement constitutes reversible error, and that the district court therefore erred in denying his request for a mistrial. Although we agree that the prosecutor improperly commented on Valley's refusal to testify, we find the prosecutor's action to be harmless error, and therefore affirm.

In *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the Court stated that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." We find that the evidence of Valley's guilt was overwhelming. The testimony of Mark Ina, Elton Lee and Tami Ina was consistent and highly detailed. Valley was a former postal employee and had access to postal keys and uniform. Each of the co-conspirators testified that they got the stolen checks from Valley or at his direction. Mark Ina testified that he was selected by Valley to act as his driver and personally viewed Valley entering postal vehicles and removing Treasury checks. The jury also heard testimony about Valley's prior conviction for a similar offense. In addition to the testimony of the co-con-

spirators, there was a paper trail of stolen checks linked directly to Valley for his use and benefit: Susie Thompson was identified as the person who had cashed a stolen check, which was used to purchase a money order later used to pay a payment on Ricky Valley's car.

In sum, there was overwhelming evidence supporting the proposition that Valley was guilty of the crimes and counts charged. In the light of this evidence, we find that the prosecutor's comments were completely harmless, and are convinced "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828.

## C

■ Finally, Valley argues that the government exercised its peremptory challenges in a racially discriminatory manner in violation of *Batson v. Kentucky, supra.* It is well settled that the use of peremptory challenges to strike venirepersons "solely on account" of race violates the equal protection component of the Fifth Amendment. *Batson*, 476 U.S. at 89, 106 S.Ct. at 1718. This court has adopted a deferential standard of review where the trial court has required the prosecution to explain its use of peremptory challenges and finds no racial discrimination. *United States v. Moreno*, 878 F.2d 817, 820–21 (5th Cir. 1989). As we explained in *Moreno*, "[s]ince the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Id.* at 821 (citations omitted).

■ The district court determined that Valley made out a prima facie case of improper use of peremptory challenges under *Batson* because defendant Valley is black and the prosecutor struck three black venirepersons from the jury, venirepersons Moffett, Reliford, and Frederick. The judge then asked the prosecutor to articulate race-neutral reasons for striking the black jurors. The prosecutor stated that he struck venireperson Moffett because she was single, had only held down her job at Eckerds for two years, and did not

"have that strong of a tie to the community as other jurors had." The prosecutor justified his challenge to Reliford because his brother had been convicted for robbery. Finally, the prosecutor explained his strike of Frederick because his brother had been charged with aggravated assault and attempted murder. Moreover, the prosecutor indicated that he struck two additional white venirepersons for similar reasons. Venireperson Jordan was struck because her son was a drug addict and had been involved in a robbery. Similarly, the prosecutor struck venireperson Nini because she also had a close relative who had been involved with a serious crime. The trial court determined that the government's stated reasons for striking venirepersons Moffett, Frederick, and Reliford were racially neutral and did not constitute the systematic exclusion of black venirepersons.

Defense counsel responded that the proffered reasons were pretextual. He pointed out to the trial judge that while the prosecutor struck black venirepersons Frederick and Reliford because their family members had either been charged with or convicted of crimes, the prosecutor did not strike white venirepersons Tiner or McGill, even though they both had family members who were convicted of serious crimes. Specifically, Tiner had a brother-in-law that went to the penitentiary for robbery, and McGill had a brother who was convicted of robbery in 1946. Tiner and McGill ultimately served on Valley's jury.[1]

Defense counsel made the very same arguments to the district court that it makes to this court. The district court considered Valley's argument that the prosecutor's explanations were pretextual and concluded that the prosecutor had not exercised the peremptory challenges based solely on race. The record supports the district court's conclusions. There are race-neutral differences between venirepersons Reliford and Frederick and venirepersons Tiner and McGill. First, Reliford and Frederick each had a close family member who had been convicted of a violent felony. Tiner's rela-

tive, in contrast, was his brother-in-law. Although McGill's brother was convicted of a similar felony as Reliford's, McGill's brother had been convicted 45 years earlier. The prosecutor's strikes of white venirepersons Nini and Jordan is further evidence that there was no exclusion of any venireperson based on race.

Finally, we note that the district court alluded to additional race-neutral factors that supported the prosecutor's decision to strike venirepersons Frederick and Reliford and not strike Tiner and McGill. Indeed, the judge's first reaction when Androphy raised the *Batson* claim was, "I can think of a number of reasons [for striking the three black venirepersons] myself." In *Jones v. Butler*, 864 F.2d 348, 369–70 (5th Cir.1988), we described the role of the trial judge in making a *Batson* determination:

> The trial judge then evaluates, "consider[ing] all relevant circumstances," whether the prosecutor's explanation is race-neutral or a pretext for excluding potential jurors based on race. In making this determination the trial judge had available not only the prosecutor's explanation, but also the judge's observations of the demeanor of the prosecutor and the veniremen. As the Supreme Court noted in *Batson*, the finding of intentional discrimination in use of peremptory challenges is a finding of fact that "largely will turn on evaluation of credibility." (citations omitted)

In the light of the great deference that we must give to the district court's findings in our case, we cannot conclude that the trial judge erred in his decision to deny defendant's *Batson* motion under these circumstances.

### IV

For the foregoing reasons, the defendant's convictions are

AFFIRMED.