UNITED STATES

v.

Cadet First Class Shannon L. POWELL,
United States Air Force.

ACM 33670.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 6 Nov. 1998.

Decided 30 July 2001.

Appellate Counsel for Appellant: Mark L. Waple (argued), Colonel Jeanne M. Rueth, and Major Thomas R. Uiselt.

Appellate Counsel for the United States: Captain Christa S. Cothrel (argued), Colonel Anthony P. Dattilo, and Lieutenant Colonel Ronald A. Rodgers.

Before SCHLEGEL, BURD, and BRESLIN, Appellate Military Judges.

## OPINION OF THE COURT

SCHLEGEL, Senior Judge:

The appellant was convicted at a general court-martial of rape and conduct unbecoming an officer in violation of Articles 120 and 133, UCMJ, 10 U.S.C. §§ 920, 933. His approved sentence included a dismissal and confinement for 42 months. We note the order in this case incorrectly lists Charge I as a violation of Article 121 instead of Article 120. In addition, the order indicates the appellant was found guilty of the specification of Charge II when he was acquitted of that Charge and Specification. He raises six errors for our review. We affirm the findings and sentence.

### I. Legal and Factual Sufficiency of the Finding of Guilty for Rape

The victim was a high school senior. The appellant was in his final year at the Air Force Academy. They met for the first time on Friday, 6 March 1998, when the appellant, along with other cadets, arrived in Los Angeles, California, to serve as escorts at a charity ball. The appellant and victim were observed getting along well together during activities that day by the sponsors of the ball who paired them together for the event. The next night at the ball, the victim and the appellant danced and interacted socially with other cadets, debutantes, and family members. On Sunday, 8 March, there was a farewell party for the cadets. After the party, the cadets were taken to the airport to

return to the Academy. At the airport, the appellant gave the victim a kiss, and they exchanged e-mail addresses and telephone numbers.

The victim testified she was "swept off her feet" by the appellant, and they began e-mailing and calling each other. She said that the appellant injected sex into their conversations and that she responded in kind. However, she told the appellant that she was a virgin and did not want to have sexual intercourse with him. Within a month, the victim agreed to visit the Academy and the appellant sent her an airplane ticket. Other debutantes also planned to visit the Academy during the same time frame.

The victim flew to Colorado Springs, Colorado, on Thursday, 2 April 1998, a day earlier than the other debutantes. The appellant met her at the airport, and they went to the hotel where she and the other debutantes had rented two hotel rooms. After checking-in, the victim and the appellant engaged in kissing, touching, and "oral sex" in her room. The victim said this sexual contact was consensual. The two went out for dinner and then the appellant returned her to the hotel. He went back to the Academy for the evening.

On Friday morning, 3 April, the appellant took the victim to the Academy for a tour. After leaving the Academy, they went to a local park called the Garden of the Gods. While at the park in a cave, they engaged in more consensual kissing, touching, and oral sodomy. The appellant tried to convince her to have sexual intercourse in the cave because it would be "a great place for her first time." She refused and reminded him she was not going to engage in sexual intercourse with him. After getting something to eat and seeing a movie, they returned to the hotel where three of the other debutantes had finally arrived. Later, the appellant left the hotel and went back to the Academy.

On Saturday, 4 April, the victim and the other debutantes attended a parade at the Academy. After the parade, the debutantes and cadets went to a local mall. The victim and appellant rode alone in his car. While returning to the hotel from the mall, the victim performed "oral sex" on the appellant and he fondled her vagina. At the hotel, the appellant informed the victim that he had rented another room at a nearby inn so they could talk later. The appellant and victim moved her luggage to this room. That night, all the cadets and debutantes ate dinner at a local restaurant. After dinner, the appellant and another cadet bought alcoholic beverages to take back to the hotel.

At the hotel, with the appellant's assistance and encouragement, the victim got drunk. She testified that she passed out, had difficulty walking, and felt sick. Witnesses confirmed that her speech was slurred, that she became loud and giggly, and had difficulty walking. The witnesses indicated the appellant was not intoxicated. When the appellant took the victim to the debutantes' other hotel room, one of the cadets became concerned that something sexual might occur because the victim was drunk. The cadet also heard the victim tell the appellant, "Your plan worked, you got me drunk."

Very early on Sunday morning, 5 April, the appellant took the victim to the room he had rented. The victim testified that once there, she passed out on the bed. When she came to, the victim discovered the appellant had removed some of her clothes and was going through her luggage. The next time she woke up, more of her clothes had been removed and the appellant was trying to put a black nightgown on her. The next thing she remembered was the appellant removing the black nightgown and placing a white nightgown on her. When she awoke the next time, the appellant was naked and on top of her. He told her that he wanted to have sex. The victim repeatedly told him no but he pinned her arms with one hand, lifted the nightgown, and penetrated her. After the rape, the victim said whenever she tried to leave the room, the appellant would awaken and insist she return. She called one of the debutantes and tried to signal that she needed help but could not speak freely because the appellant was listening to her. Later that morning, the appellant took the victim to the airport for her return flight to Los Angeles.

After she was back home on Sunday evening, the victim replied to an e-mail she received from the appellant. Later in the evening, the appellant called and informed the victim that he had a girlfriend and was planning on living with her soon. The victim telephoned one of the debutantes who was still in Colorado Springs and said the appellant had taken advantage of her. The victim was crying and upset.[1] On Monday, 6 April, the victim reported the rape to a school counselor but did not want the police contacted.

The victim and the appellant continued to correspond via e-mail and the telephone. These e-mails were admitted into evidence. A little over two weeks after the incident, the appellant made a late night call to the victim. She recorded a portion of this conversation using her answering machine. On the tape, the appellant instructed the victim to lie about what happened when they were alone on 5 April. The victim also corresponded with other cadets who attended the ball, including the appellant's roommate. Some of these e-mails were also admitted as evidence.

On 28 April 1998, over the telephone and with help from the appellant's roommate, the victim reported the rape to a special agent (SA) from the Air Force Office of Special Investigations (AFOSI), stationed at the Academy. Subsequently, the victim was interviewed by AFOSI agents in Los Angeles.

### Analysis

 The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987). When testing for legal sufficiency, we must "draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. McGinty*, 38 M.J. 131, 132 (C.M.A.1993) (quoting *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A.1991)). Our superior court has determined the test for factual sufficiency is whether, after

weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we ourselves are convinced of the accused's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325. Recently, we have suggested that this test for factual sufficiency conflicts with the test that Congress intended us to apply. *See United States v. Washington*, 54 M.J. 936, 940 (A.F.Ct.Crim.App.2001) (Congress specified we should affirm a finding of guilty if we determine it conforms to the weight of the evidence and that there has been no error of law that prejudiced the substantial rights of the accused.). The elements of rape are that the accused committed an act of sexual intercourse, and that the act of sexual intercourse was done by force and without consent. *Manual for Courts-Martial, United States (MCM)*, Part IV, ¶ 45b(1) (1998 ed.).

The appellant argues the victim has no credibility and that the appellant's acquittal of forcible sodomy requires that we set aside his conviction for rape. However, the victim was subjected to aggressive cross-examination that highlighted every possible inconsistency in her testimony. The defense portrayed her as the jilted lover, intent on revenge and the ruination of the appellant with false and malicious accusations. Her delay in reporting the crime and continued correspondence with the appellant after the incident was painted as inconsistent with being the victim of a sexual assault. Despite this broad attack, the court members determined her testimony about what happened in the room that night was credible. After reading the record and listening to the tape recording, we find that the verdict should be affirmed. Article 66(c), UCMJ, 10 U.S.C. § 866(c).

 The victim testified that early Sunday morning, upon awakening from a drunken stupor, she found the appellant naked and on top of her. The appellant said he wanted to have sex. She said no. Undeterred by her refusal, the appellant pinned her arms, lifted her nightgown, and had sexual intercourse with her anyway. Once back home, she re-

---

1. When this debutante returned to California on Wednesday, 8 April, the victim told her that the appellant forced the victim to have sexual intercourse with him.

ported the crime to a school counselor the next day. There was no evidence at trial that she ever changed her story about this assault, but she was ambivalent about whether to report the incident to law enforcement authorities. While the victim admitted to consensual sexual activity with the appellant over the course of two days prior to the rape, she insisted he knew that she was a virgin and did not want to have sexual intercourse with him. The tape recording of the appellant telling the victim to lie about what happened in the room that night added credibility to her testimony about the rape. Finally, contrary to the appellant's logic, we view his acquittal of forcible sodomy as proof that the member's critically examined the evidence in accordance with the judge's instructions. *See United States v. Powell,* 469 U.S. 57, 66, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (accused may not challenge inconsistent verdicts as error).

We have considered the evidence in the light most favorable to the prosecution and found all the essential elements beyond a reasonable doubt. We have also weighed the evidence in the record of trial after making allowances for not having personally observed the witnesses. We are convinced of the accused's guilt whether we apply the beyond a reasonable doubt or the "conforms to the weight of the evidence" standard. *See Washington,* 54 M.J. at 940.

## II. Ineffective Assistance of Counsel

The appellant argues that his attorneys at trial did not represent him effectively because they failed to object to the admission of the tape recording of his conversation with the victim. On the tape, the appellant counsels the victim to lie about what happened in the room on the night of the rape. The appellant complains the prosecution did not lay a sufficient foundation for admission of the tape recording, and that had an objection been made, the tape would not have been admitted.

The tape was admitted into evidence at the preliminary Article 39(a), UCMJ, session. Defense counsel did not object. However, before the tape was played for the members, the victim identified the tape and said it contained a conversation between her and the appellant. She said the call, made by the appellant, occurred in the middle of the night on a Wednesday, about two weeks after the incident. The victim said she made the tape for her "own personal well-being." She described how her answering machine worked and that she started to record the conversation sometime after they began talking. She also said she stopped recording for a period of time because she did not know how much tape was left on the cassette and started recording again before the conversation ended. The victim said the voices on the tape were her own and the appellant's. After the tape was played for the members, she identified the voices again.

### Analysis

■ In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court established the standard of review for claims of ineffective assistance of counsel. The two-prong test requires an appellant (1) to show that counsel's performance was deficient (i.e. counsel's errors were so serious that counsel did not function as "counsel" as guaranteed by the Sixth Amendment), and (2) to show the deficient performance prejudiced appellant's case. *Id.* at 687, 104 S.Ct. 2052. Judicial scrutiny of counsel's performance must be highly deferential. *See United States v. Scott,* 24 M.J. 186 (C.M.A.1987). We will not find counsel ineffective for failing to object to evidence that is admissible under the rules of evidence. *United States v. Voorhees,* 50 M.J. 494, 500 (1999) (citing *United States v. Flack,* 47 M.J. 415, 417–18 (1998)).

■ "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Mil. R. Evid. 901(a). The requirements of the rule are met by "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Mil. R. Evid. 901(b)(5). "[A]uthentication is a component of relevancy (evidence admitted as something can have no probative value unless that is what it really

is)." *United States v. Blanchard*, 48 M.J. 306, 309 (1998).

We find that our superior court's opinion in *Blanchard* is controlling on this issue. In that case, the Court rejected the accused's argument that the federal circuits required a seven-prong analysis for authenticating an audio tape and also held that military judges were not required to use that analysis. *Id.* at 310. More importantly, the Court found that Mil. R. Evid. 901(b)(5) provided for a "more flexible approach" to the authentication of an audio tape in a court-martial. *Id.*

While the Court's holding in *Blanchard* is controlling, the facts in that case are distinctly different from the facts presented in the instant case. The only real similarity is that both cases involved taped telephone conversations. In *Blanchard*, an enlisted soldier made the tape. She taped the accused, an officer, while they were talking about their past sexual relationship. Apparently, she recorded the conversations at the behest of her enlisted boyfriend who felt it was necessary to protect them from retaliation by the accused. She admitted erasing part of the tape and also said it was stolen from her. The tape was missing for two days and when it was returned, she could not recall whether it had been altered. She testified as to the dates and content of the conversations, how they were recorded, and identified her own voice and that of the accused on the tape. In addition, a voiceprint examiner testified that she matched the soldier's and the accused's voices on the tape. The accused's wife and friends also identified his voice on the tape. The Court agreed with the judge that this was a sufficient foundation to present the tape to the members. *Id.* at 310.

In oral argument, the appellant claimed that because the Court in *Blanchard* noted the testimony of the voiceprint examiner and the accused's friends in identifying his voice, Mil. R. Evid. 901(b)(5) has been judicially modified to require more than a single opinion that the voice heard on a tape is that of an alleged speaker. We reject that argument. In view of the history of the tape in *Blanchard*, we understand how this other evidence was helpful to the judge, members, and appellate courts in evaluating the au-

thenticity of the tape and assessing the weight it was to be given. However, in the case sub judice, the questions about the tape's authenticity were straightforward and did not require scientific verification or other evidence before being presented to the members for their determination.

The appellant also complains that the tape only contained about four minutes of what was a conversation that lasted between 45 minutes and one hour. At trial, defense counsel used this disparity to suggest the victim had edited the tape. However, during cross-examination and on redirect, the victim flatly denied modifying the tape in any fashion. In response to a question from the judge, the victim said she did not own a recorder that could be used to edit the tape. Even if she had, "the existence of deletions or suspected deletions from the tapes and gaps in the chain of custody do not per se bar admission of ... audio tapes." *Id.* at 311 (citing *United States v. Sandoval*, 709 F.2d 1553, 1554–55 (D.C.Cir.1983)). The possibility of misidentification of the appellant's voice was never an issue. In fact, the appellant identifies himself on the tape by confirming the history of his relationship with the victim.

The appellant's conversation with the victim on this tape was relevant evidence in determining whether or not he raped the victim as she alleged. Mil. R. Evid. 401. We find the victim's testimony provided a sufficient foundation under Mil. R. Evid. 901(b)(5) to submit the tape to the members for their consideration. Failure to object to its admission was not ineffective representation as defined by *Strickland* and military case law. The record of trial and post-trial submissions leave no doubt that the appellant was well-represented by his military attorneys.

### III. Peremptory Challenge of Captain (Capt) Bunch

The convening authority selected eight men and two women (Capts Bunch and Costigan) to hear the appellant's court-martial. The lead trial counsel (TC) was a woman. Assistant trial counsel (ATC), who conducted the voir dire, was a man. Both defense counsel were women.

During the prosecution's voir dire, the ATC initially questioned individual court members about their prior experience serving on courts-martial or administrative discharge boards. He then transitioned into addressing a specific question to an individual court member. The ATC then followed-up by asking the same question of the rest of the court members as a group. He asked Lieutenant Colonel (Lt Col) Johnson whether he believed a woman who had been drinking alcohol forfeited her right to say no to sexual conduct. After an exchange with the judge, Lt Col Johnson replied that he didn't think it should have any effect. Immediately thereafter, ATC asked the court members the same question.

ATC: Does any member of the panel feel that a woman who has been drinking alcohol gives up her right to say "no" to sex? (Pause) I'm sorry, Captain Bunch, have you indicated—

MEMBER (CAPTAIN BUNCH): No.

This was the only time during the entire voir dire process that either counsel had to inquire about a response to a question directed at the entire panel.

The prosecution did not request individual voir dire of any court member but the appellant questioned three of them. Colonel (Col) Berry was asked about his duties at the Academy, which involved the cadet honor code. Major (Maj) Tobin was examined about his work for a crisis intervention helpline during college. Capt Costigan was questioned extensively about her religious beliefs. The appellant's challenge for cause against Col Berry was denied.[2]

The prosecution used their peremptory challenge against Capt Bunch. The appellant's Circuit Defense Counsel (CDC) asked for a gender-neutral explanation. The ATC explained:

Your Honor, the reason for the peremptory challenge on Captain Bunch is basically her demeanor during voir dire. When I was conducting voir dire—and that's the main reason, and basically just on a trial counsel hunch due to her demeanor.

There's no other reason than that that I can proffer for the court, Your Honor.

MJ: Was that any part of that reason the fact that she is female?

ATC: No, Your Honor.

MJ: And whose intuition or hunch was it? Yours or Major Townsend's?

ATC: Your Honor, it was a dual hunch, and I am not certain if Captain Bunch was a legal assistance client at the 10th Air Base Wing recently who, in the course of a will preparation, as often happens it took longer than the clients had expected, and I'm not sure—Captain Bunch looks very familiar; I was involved in that process as well, so I don't—that was another thing in the back of my mind as we were discussing the challenge.

After a recess, the appellant, citing *United States v. Ruiz*, 49 M.J. 340 (1998), argued that the prosecution's explanation was insufficient. The judge asked defense counsel whether she believed assistant trial counsel was "being less than truthful with me as to his reason for the peremptory challenge." Defense counsel refused to answer this question from the judge. After a discussion, the judge continued to press defense counsel about trial counsel's candor.

MJ: The issue before the court is whether the prosecutor improperly exercised a peremptory challenge by basing it at least in part upon the gender of the member. *The trial counsel has told me "no," that the member's gender had nothing to do with his determination to challenge the member peremptorily, and on its face his statement seems to make sense.* And I noted, when I asked which trial counsel had that assessment, it was apparently both of the trial counsel, one of whom is, I note, female, so I asked that in part because I suppose one could question whether there might be a subconscious bias that perhaps Captain Hurcomb would not have expressed or even thought of in disclosing the basis for the peremptory challenge, but his statement on its face to the court is that Captain Bunch's gender played no role in the peremptory challenge. *Now do*

2. The appellant used his peremptory challenge against Col Berry.

*you have any basis to believe to the contrary, that he challenged her because of her gender?*

CDC: *Well, I'm just very concerned that, you know, they've left one woman on the panel who thinks that adultery is a sin and they took the other one, so that's the problem I have with their selection.* And they're using, you know, a basis to say, "Well, this is my *Batson* reason" for something that they haven't even examined. They haven't actually articulated a well reasoned purpose for their selection. I mean basically he just stood up and said, "Well, it's a hunch," and then, "Oh, well, I guess it's this other thing." So . . . .

MJ: Your talking about the wills matter?

CDC: Yes.

MJ: *Well, even short of that, her reaction during questions, during voir dire. That seems to me to be something which counsel are entitled to consider in exercising a peremptory challenge, and if counsel is being truthful on that, that certainly is a legitimate basis.* The whole idea of a peremptory challenge is that each side has a challenge available to them for reasons which need not be articulated or proven under normal circumstances, and need not be proven, even if they must be articulated because of a *Batson* challenge, and the reasons advanced by Captain Hurcomb are legitimate reasons. *His assessment of her reaction to questions is a legitimate basis, without further explication for exercise of a peremptory challenge in this court or in any court where there are actually jurors.* Anything further?

CDC: Well, you know, for the appellate record, I would just like Captain Hurcomb to articulate what reaction?

MJ: You mean specifically was it a raised eyebrow, a puzzled look, a scratching the head, that sort of thing?

CDC: Yeah, I would like him to specifically articulate what particular questions or what reactions were they?

MJ: Can you articulate the reactions, Captain Hurcomb?

ATC: If I may address one issue, Your Honor? During the break I did check our data base and also checked with a parale-

gal and it turns out that Captain Bunch was not the individual during the will process. *The primary reason still stands; it was her demeanor during the voir dire. I personally noted when I was asking the questions that she appeared to be very, she was not as forthcoming as the rest of the panel members. My co-counsel, Major Townsend, actually picked up more on her demeanor, and read that to be either negative or not inclined to listen to the questions that I was advancing. So it was, in discussions with co-counsel, the primary issue was the demeanor of Captain Bunch during the entire voir dire.*

MJ: Major Townsend, do you want to add anything to that?

TC: *No, sir. I think that accurately describes my concerns. It appeared to me that she was becoming more and more inflexible, given the questions that Captain Hurcomb was describing. When the defense conducted their voir dire, she seemed to be more open. She seemed to be able to answer more readily and without hesitation, and that would suggest to me that she either didn't like the way Captain Hurcomb was asking the questions or she didn't like the questions that she was hearing, and it was for those reasons that Captain Hurcomb and I decided that she was not a member, or that was a member that we should exercise our peremptory against.*

(Emphasis added.)

After an exchange about the pace of Capt Bunch's answers, defense counsel stated she hadn't noticed anything unusual about Capt Bunch's demeanor. The judge granted the prosecution's peremptory challenge of Capt Bunch.

### Analysis

In 1988, the United States Court of Military Appeals (now the United States Court of Appeals for the Armed Forces), applied the United States Supreme Court's holding in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to courts-martial as "part of due process under the Fifth Amendment." *United States v. Santiago–Davila*, 26 M.J. 380, 390 (C.M.A.1988). In

1989, an accused's burden in establishing purposeful discrimination at a court-martial was eased by the adoption of a prospective per se rule that required trial counsel to explain the use of a peremptory challenge against "a member of the accused's race, upon objection." *United States v. Moore,* 28 M.J. 366, 368 (1989).

In 1997, our superior Court concluded "gender, like race, is an impermissible basis for the exercise of a peremptory challenge by either the prosecution or a military accused." *United States v. Witham,* 47 M.J. 297, 298 (1997) (citing *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994)). In 1998, the Court extended the per se rule first recognized in *Moore* to peremptory challenges where gender may be a factor and rejected any requirement that an accused must be the same gender as the court member. *Ruiz,* 49 M.J. at 343.

In discussing the type of reason that trial counsel had to provide in order to have their peremptory challenge sustained, our superior court held that:

> Although the reasons stated need not rise to the level justifying a challenge for cause, trial counsel cannot assure or intuit that race makes the member partial to the accused and cannot merely affirm his good faith or deny bad faith in the use of his challenge.

*Moore,* 28 M.J. at 369. *See Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). The Supreme Court provided additional guidance about what would constitute a sufficient race-neutral explanation when they held that "a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett v. Elem,* 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (*per curiam*). However, our superior court declined to apply the holding in *Purkett.* Instead, they held that neither side may exercise a peremptory challenge against a court member for a reason "that is unreasonable, implausible, or that otherwise makes no sense." *United States v. Tulloch,* 47 M.J. 283, 287 (1997).

Counsel's demeanor and credibility in providing an explanation for the challenge is a critical factor in the judge's determination on the issue.

> In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (quoting *Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)). Therefore, argument of counsel is normally sufficient to assess the basis for the challenge. *Tulloch,* 47 M.J. at 288.

> On appeal, the military judge's determination on the issue of purposeful discrimination is given great deference because it is based primarily upon the judge's personal evaluation of the credibility of the counsel making the peremptory challenge.

*United States v. Chaney,* 53 M.J. 383, 385 (2000).

Where a court member's demeanor is offered as a basis for the peremptory challenge, trial counsel must link the demeanor with a reasonable, race neutral-basis for the challenge. *Id.* If there is also a factual dispute about the court member's demeanor,

> [t]he military judge *normally* can and should resolve a dispute about the factual basis for a peremptory challenge without an evidentiary hearing. When the dispute involves in-court observations about a member, the military judge *may* be able to make findings of fact based upon his or her own observations as to whether the member exhibited the behavior referenced by counsel. In any case, the military judge *should* make findings of fact when the underlying factual predicate for a peremptory challenge is disputed.

*Id.* (emphasis added) (citation omitted). Optimally, an express ruling on this question is preferred. *United States v. Gray,* 51 M.J. 1, 34 (1999), *cert. denied,* —— U.S. ——, 121 S.Ct. 1354, —— L.Ed.2d —— (2001). However, if a judge states he is satisfied with counsel's denial that the motive in making the challenge involved any sexist intent, and defense counsel refuses to dispute that fact, we may find that the judge's comment constitutes an "implied ruling" that the "explanation was genuine and that appellant's [*J.E.B*] claim was without merit." *Id.* at 35 (citations omitted).

■ We will only overturn a judge's decision that there is no purposeful discrimination if it is clearly erroneous. *Id.* (citing *United States v. Greene,* 36 M.J. 274, 281 (C.M.A.1993)). The standard of review in this area of the law is difficult to apply because a judge is attempting to peer into an attorney's heart by relying on his or her words.

In law, what plea so tainted and corrupt
But, being seasoned with a gracious voice,
Obscures the show of evil.

William Shakespeare, *Merchant of Venice,* act 3, sc. 2.

■ We find that trial counsel provided a gender-neutral explanation for the exercise of the peremptory challenge that was reasonable, plausible, and made sense. Admittedly, the initial representation from assistant trial counsel that the challenge was based upon "demeanor" and "hunches" was extremely vague. While sufficient under the Supreme Court's guidelines for the permissible exercise of peremptory challenges (*see Purkett v.*

*Elem*), it was not immediately apparent that the explanation for the challenge met the different test for the military promulgated by our superior court in *Tulloch,* 47 M.J. at 287.[3] However, upon further questioning by the judge, both trial counsel comprehensively explained the basis for the peremptory challenge. The trial counsel noted that the member's demeanor during questioning—open and responsive to defense counsel and hesitant and non-responsive towards trial counsel—indicated the member either didn't like the assistant trial counsel or had reservations about legal theories crucial to the government's case. Both trial counsel were able to link the member's demeanor to a reasonable, plausible, gender-neutral reason for the challenge. *Chaney,* 53 M.J. at 385.

It is important to distinguish this case from others where "demeanor" was the basis for a peremptory challenge. In *Tulloch,* the explanation for the peremptory challenge was that the member blinked excessively and that he seemed uncomfortable. The Army Court of Criminal Appeals held that this explanation "did not articulate any *connection,* race-neutral or otherwise, between ... the member's demeanor and what that demeanor indicated concerning the rejected member's ability to faithfully execute his duties on the court-martial." *United States v. Tulloch,* 44 M.J. 571, 575 (Army Ct.Crim. App.1996) (emphasis added), *aff'd,* 47 M.J. 283 (1997). Our superior court also found error for the same reason, holding that the mere mention of a particular demeanor, without more, did not provide a sufficiently articulated reason to sustain the challenge. *Tulloch,* 47 M.J. at 288. In this case, however,

---

**3.** In federal practice, a peremptory challenge based on counsel's perception of the member is not improper. *See Troupe v. Groose,* 72 F.3d 75, 76 (8th Cir.1995) (affirming challenge where proffered reason was that juror had offensive demeanor, was disagreeable and amused at the process, and was uncommunicative); *United States v. Johnson,* 4 F.3d 904 (10th Cir.1993) (affirming challenge where proffered reason was that juror was inattentive and would not be able to pay attention to the evidence); *United States v. Bentley–Smith,* 2 F.3d 1368, 1380 (5th Cir.1993) (affirming challenge where proffered reason was that juror "appeared to be a follower"); *United States v. Casper,* 956 F.2d 416 (3rd Cir.1992) (affirming challenge where proffered reason was

that juror appeared evasive and inarticulate in responses); *Reynolds v. Benefield,* 931 F.2d 506 (8th Cir.1991) (affirming challenge where proffered reason was that juror looked bored and appeared hostile); *Barfield v. Orange County,* 911 F.2d 644, 648 (11th Cir.1990) (affirming challenge where proffered reason was that juror was looking at the challenging party with hostility); *United States v. Moreno,* 878 F.2d 817, 820–21 (5th Cir.1989) (affirming challenge where challenging party had a " 'gut reaction' that a commercial artist would have sympathy for persons involved with drugs"); *United States v. Roan Eagle,* 867 F.2d 436 (8th Cir.1989) (affirming challenge where proffered reason was that juror was "slovenly").

trial counsel established a connection between the observed demeanor and the member's ability to serve on the court-martial—specifically, that the member was either predisposed to the defense or had an aversion to the prosecution. This is a sufficient basis for the exercise of a peremptory challenge.

■ The appellant maintains the judge was required to make findings of fact concerning the challenged member's demeanor, and that his failure to do so precludes this Court from affirming his ruling on the peremptory challenge. While it would have been preferable for the judge to enter findings of fact, thus facilitating appellate review, his failure to do so is not determinative. We note that our superior court used conditional terms like "should" and "may" when discussing the obligations of a judge in resolving factual disputes concerning such matters. *Id.* No doubt, our superior court recognized that a judge cannot be expected to know the intricate facts of a case beforehand, or the legal theories or strategies counsel has planned for trial. Thus, a judge cannot in every instance appreciate the significance of a member's answer. Also, as a practical matter, a judge cannot observe every reaction by a court member during questioning.[4] Therefore, a judge is not required, in all cases, to make factual findings regarding a member's demeanor in order to sustain or deny a challenge. *But see United States v. Jackson,* 52 M.J. 756 (A.F.Ct.Crim.App. 1999). The judge's failure to make factual findings in this case does not prevent us from affirming his ruling on the peremptory challenge, especially where, as here, there is other evidence in the record that the challenged member was hesitant in answering assistant trial counsel's voir dire questions.

The credibility of counsel in presenting their explanation for the peremptory challenge is another important factor to be considered in deciding whether the proffered challenge is pretextual. *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859; *Chaney,* 53 M.J. at 385. The appellant notes the judge's failure to make specific findings regarding the reasonableness of the prosecution's explanation for the peremptory challenge and the sincerity of the prosecutor in making the challenge, and argues that we therefore lack a basis to sustain his ruling. We do not agree.

The judge twice commented, during the discussion of the defense objection, that trial counsel's assessment of the member's reactions during voir dire was something counsel was entitled to consider in exercising a peremptory challenge. He also commented that, "on its face his statement seems to make sense." The defense counsel never disputed Capt Hurcomb's denial, which we also attribute to Maj Townsend, that Capt Bunch's gender had anything to do with the challenge. This failure by the defense supports the judge's express finding that the prosecution's explanation provided "legitimate reasons" for the challenge. This conclusion constitutes an implied ruling that the explanation was reasonable. *See Gray,* 51 M.J. at 35. We find sufficient basis in the record of trial to conclude that the judge was

4. Voir dire is a data gathering process for attorneys to determine whether court members should be disqualified due to bias (for cause), or for a self-determined/arbitrary (peremptory) reason. *United States v. Jefferson,* 44 M.J. 312, 317–19 (1996). In her dissenting opinion in *Tulloch,* Chief Judge Crawford characterized the information derived from voir dire as either "hard data" or "soft data." *Tulloch,* 47 M.J. at 293–95 (Crawford, J., dissenting). Attorneys develop their own experience-based criteria for conducting voir dire and evaluating the verbal and nonverbal responses of court members. Every attorney who has tried a case before jurors or court members knows that intuition plays a role in assessing how the court members are responding to him or her personally, or legal concepts that are crucial to the case. This is not unique to attorneys. As human beings, we use our experiences and intuition to make judgments about people everyday. Most of us have learned, compliments of the school of hard knocks, to trust and act on our instincts or intuition. However, even in casual situations, it is sometimes difficult to catalogue or express why we trust some people but are suspicious of others. In the courtroom, it can be even more intimidating because no attorney wants to impugn someone who has just taken an oath to be fair and impartial. In the military justice system, as opposed to the civilian system, the court member that counsel removes today may be someone they have to work with tomorrow. Into this already sensitive area, we tee-up the issue of race or gender by almost encouraging opposing counsel to reflexively question the other side's motivation in exercising their peremptory challenge.

satisfied with the reasonableness of the prosecution's explanation.

Similarly, there is a sufficient basis in the record to conclude the judge was satisfied that the trial counsel were being truthful in their assertion regarding the basis for the peremptory challenge. The judge was obviously aware that the credibility of counsel was a significant consideration. While discussing the defense objection, the judge specifically noted that the legitimacy of the peremptory challenge depended upon whether assistant trial counsel was being truthful in his assertions. Indeed, the judge queried trial defense counsel on whether she believed trial counsel was not being truthful, and trial defense counsel declined to state that she believed the representation was not truthful. In light of this, we are satisfied that the judge considered the uncontested credibility of counsel in arriving at his decision regarding this peremptory challenge. Of course, a specific finding regarding the credibility of counsel would have obviated this issue upon review.

We conclude the judge did not abuse his discretion in sustaining the prosecution's peremptory challenge of Capt Bunch. Like the judge, we find the trial counsel's explanations to be reasonable, credible, and not pretextual.

We cannot leave this issue without commenting on some troubling aspects of this case pertaining to the operation of the per se rule. In *Batson*, the Supreme Court established a procedural approach for handling objections to peremptory challenges. The *Batson* process involves three steps: 1) The counsel objecting to the challenge must present a prima facie case of discrimination in the use of the peremptory challenge; 2) The burden then shifts to counsel exercising the challenge to state a race-neutral basis; and 3) The judge must then decide whether the objecting party has established purposeful discrimination. *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712. The per se rule extensively

modifies the first step by relieving the objecting party of the need to make a prima facie showing of unlawful discrimination by only requiring an objection to the exercise of a peremptory challenge to a member of a protected class. *Moore*, 28 M.J. at 368. *See also Ruiz*, 49 M.J. at 342.

Unfortunately, as this case shows, the per se rule has serious flaws. The first is that the counsel requesting an explanation for the peremptory challenge need not present any evidence showing purposeful discrimination. Without this evidence, the judge's findings may be incomplete. This lack of a requirement to show evidence of purposeful discrimination also means that an explanation for the challenge may be requested without any basis for doing so. As a result, the per se rule can be easily abused. Here, trial defense counsel requested an explanation for the peremptory challenge, relying on the per se rule. Trial counsel responded as noted above. The judge queried trial defense counsel about whether she accepted this explanation, or thought the prosecutor was acting in bad faith.

> MJ: Now do you have any basis to believe to the contrary, that he challenged her because of her gender?
>
> CDC: Well, I'm just very concerned that, you know, they've left one woman on the panel who thinks that adultery is a sin and they took the other one, so that's the problem I have with their selection....

Despite the judge's repeated queries, trial defense counsel refused to state she thought the prosecutors were making the challenge for an improper purpose.

We conclude that defense counsel's demand for a gender-neutral explanation had more to do with her objection to Capt Costigan's religious beliefs than any suspicion that the trial counsel were exercising their peremptory challenge inappropriately.[5] If anything smacked of pretext in this case, it was the CDC's request for a gender-neutral explanation, not the prosecution's decision to

---

5. To date, neither the Supreme Court nor our superior court has extended the prohibition against using race or gender in exercising a peremptory challenge to encompass religious beliefs. *Fisher v. Texas*, 169 F.3d 295, 305 (5th Cir.1999). *See also United States v. Williams*, 44 M.J. 482, 485 (1996). *But see United States v. Walbert*, 32 C.M.R. 945, 948, 1963 WL 4599 (A.F.C.M.R.1963).

challenge Capt Bunch. The purpose of the per se rule is to prevent a peremptory challenge from being used to practice unlawful discrimination. It is not a weapon to be employed in order to frustrate the legitimate use of the single peremptory challenge guaranteed to each side. Article 41(b)(1), UCMJ, 10 U.S.C. § 841(b)(1).

If we were free to analyze this issue using the procedure outlined in *Batson* and its progeny, we would conclude that based on the CDC's comment, she had not established a prima facie case of discrimination regarding the prosecution's exercise of their peremptory challenge. Her comment makes it clear that the problem she had with the challenge was not that *a* woman was challenged, but in her view, the *wrong* woman was challenged. Therefore, her request for an explanation and objection to the challenge was not based on a suspicion that the prosecution was using gender as the basis for their challenge nor that their explanation was pretextual. Instead, it was based on her preference for Capt Bunch over Capt Costigan. Unfortunately, our superior court has been adamant that we apply the per se rule in virtually every case. *See United States v. Ruiz*, 49 M.J. 340, 344 n. 2 (1998) (suggesting the per se rule may not apply in cases where the minority representation is not changed significantly by granting the challenge).

We also believe allowing one side to request an explanation without any requirement to present evidence of purposeful discrimination invites mischief in the highly competitive and often emotional courtroom environment. Realistically, one side may enjoy an "extra" peremptory challenge if the other side uses their challenge against a member that they also want off the panel. However, what if the challenged member is a woman or a minority? Does counsel rise and demand a gender or race-neutral explanation? For example, if the defense counsel had wanted to challenge Capt Bunch based on a visceral or instinctive reaction that

would not pass muster under *Tulloch*, would she have protested trial counsel's challenge? We think not. This is like allowing the foxes to decide which one is going to guard the chicken coop. In our opinion, it would be a better practice to allow the judge to decide when an explanation for the challenge is required.[6] After hearing counsel's explanation, opposing counsel must either accept the reason or present evidence of unlawful discrimination. The judge is then in a better position to resolve the matter and the record will be more comprehensive.

Our superior court's approach to ensuring that gender and race play no role in the use of a peremptory challenge by either side is a serious effort to eliminate even the appearance of this practice in the military justice system. When appropriate, all that is required is for one side to request a gender- or race-neutral explanation for the challenge. By requiring an explanation that is reasonable, plausible, or makes sense, the Court sought to guarantee that the peremptory challenge would not serve as a pretext for discrimination. However, due to the simplicity of the procedure, it can be abused. Like the boy who cried wolf too many times, the use of the per se rule as a trial tactic to shape the court is ill conceived and serves to demean its very purpose. It will lead to an evisceration of its effectiveness and ultimately render its goal illusory.

### IV. Remaining Errors

We will briefly dispose of the remaining assignments of error.

### A. Challenge for Cause Against Col Berry

■ Col Berry was the Deputy Director for Character Development at the Academy. In this position, he taught and enforced the cadet honor code. He arrived at the Academy in late August 1998. During voir dire, he denied knowing anything about the appellant or the charges.[7] The appellant challenged Col Berry for cause based on the appearance

---

6. We can state confidently that within the Air Force, there are no secrets about the reputation of trial and defense counsel. Furthermore, with the relatively small number of judges within each judicial circuit, our jurists are in a unique position to know whether counsel is regularly challenging minorities or women off court-martial panels.

7. The appellant was the subject of an honor code case before Col Berry arrived at the Academy.

of having him sit as a member of the court-martial in view of his duties. The judge denied the challenge for cause and the appellant subsequently used his peremptory challenge against Col Berry.

We find the appellant's challenge for cause based on implied bias is speculative and "unpersuasive." *United States v. Velez*, 48 M.J. 220, 225 (1998). The judge did not abuse his discretion in denying the challenge. Col Berry's duties did not render him ineligible to serve as a court member.

## B. Victim's Statements to SA Bowman and Second Lieutenant (2Lt) Palmer

■ SA Bowman was called as a witness by the prosecution. She was the AFOSI agent stationed at the Academy the victim called on 28 April. SA Bowman testified that during their conversation the victim said the appellant raped her and that she and the victim basically talked about the incident. Her direct testimony occupies less then two pages in the record of trial. No objection was interposed by the appellant to this testimony.

2Lt Palmer was the appellant's roommate and was called as a witness by him on findings. The victim corresponded with 2Lt Palmer after the rape. Near the end of his direct testimony, defense counsel questioned 2Lt Palmer whether the victim told him about the other sexual activity she had with the appellant. To each of these questions, he answered that she did not. The first question on cross-examination was whether the victim told him the appellant had raped her. He answered affirmatively. Defense counsel objected that the victim's statement to him was not a prior consistent statement. The judge overruled this objection and the brief cross-examination of this witness moved on to other areas.

The judge did not instruct the members that the victim's statements to these two witnesses were to be considered as prior consistent statements under Mil. R. Evid. 801(d)(1)(B). Furthermore, the prosecution never argued that they should be.

We find no prejudicial error in allowing these witnesses to simply state that the vic-tim said the appellant raped her. In her own testimony, the victim said she reported being raped to these individuals. An e-mail from the victim to 2Lt Palmer on 26 April, that was admitted into evidence without objection, plainly states the appellant raped her. The victim talked with SA Bowman because 2Lt Palmer arranged it for her. The judge did not abuse his discretion in permitting this testimony. The appellant suffered no prejudice or harm. Article 59(a), UCMJ, 10 U.S.C. § 859(a).

## C. The Victim's Sentencing Testimony

The appellant claims the victim's sentencing testimony was improper aggravation evidence because: (1) Impact testimony based on the judicial process is not permissible; (2) The impact on her family was not directly caused by the appellant; and (3) It amounted to a comment on the appellant's right to plead not guilty.

All of the victim's sentencing testimony is provided below.

Q: Erin, can you tell us, briefly, what kinds of emotions you've been through since April of 1998?

A: A whole range of emotions. I (sigh) have gone through so much, and through this whole trial, this whole process. I've had to tell the whole thing over and over again, and I've had my soul torn apart for everyone to see. And my family has had to go through it with me, and, (sigh) I mean I have nightmares, I have flashbacks. I have started seeing counseling and when I get back I'm going to start seeing a therapist.

Q: Where are you getting counseling?

A: At my college.

Q: At UCLA?

A: Yes.

Q. And I'm sorry I interrupted you. You were going to start seeing a therapist?

A: Yes, mm-hmm.

Q: Erin, what do you hope for in the future?

A: (Sigh) A night without nightmares. Um, I hope that one day the sound of a southern accent or someone who

looks like Shannon won't send me into complete hysterics, and I want to get over this. I want to help my family heal. I want to heal. Um, and I want to help others as well. Um, I think when I get back I'm going to start working with the Women's Resource Center at my school, and talking to high school and junior high kids and educating them, and, hopefully, stop it from happening to someone else. And maybe educate people so they understand that this is a crime.

There is an old saying about mole hills transformed into mountains that comes the closest to characterizing this assignment of error. However, this testimony does not even amount to a small bump on the surface of this case. The victim's testimony was offered pursuant to Rule for Courts Martial (R.C.M.) 1001(b)(4) which permits a wide variety of victim impact evidence. Trial judges have broad discretion to determine the admissibility of aggravation evidence. *United States v. Wilson*, 47 M.J. 152, 155 (1997). We review a trial judge's decision to admit or exclude evidence under an abuse of discretion standard. *United States v. Ayala*, 43 M.J. 296, 298 (1995). The judge did not abuse his discretion in allowing this testimony from the victim. *See United States v.*

*Fontenot*, 29 M.J. 244, 251–52 (C.M.A.1989). The victim's testimony was admissible aggravation evidence under the Rule and we do not interpret her words as a comment on the appellant's exercise of his constitutional rights. Further, we note the increasing recognition by the United States Supreme Court of the appropriate role victim impact evidence plays in dispensing justice. *See, e.g., Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

### Conclusion

The record is returned to the Judge Advocate General for correction of the court-martial order and need not be returned to this Court for further review after the order is corrected. The findings are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Accordingly, the findings and sentence are

AFFIRMED.