United States Court of Appeals
Fifth Circuit

**F I L E D**

July 20, 2007

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 06-10730

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ANTHONY STEVEN AGUILAR, also
known as Antonio; JEFFREY RYAN;
JEFFREY ALAN BREVICK

Defendants - Appellants

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 4:05-CR-195-5

Before JOLLY, CLEMENT, and OWEN, Circuit Judges.

PER CURIAM:[*]

Appellants Aguilar and Brevick were convicted of conspiracy to possess with intent to distribute and to distribute more than 50 grams of pure methamphetamine. Appellant Ryan was acquitted on that count, but was convicted of maintaining a drug-involved premises. The appellants appeal their

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

convictions and sentences on numerous grounds. For the reasons that follow, we AFFIRM.

I.

We consider first the issues raised by Aguilar. He argues that the district court erred by denying his motion to suppress and by relying on unreliable hearsay in sentencing him.

A.

Aguilar moved to suppress evidence of methamphetamine found in a box that he threw into an open garage while walking away from police officers. The police were at the apartment complex, where Aguilar lived with his girlfriend, to investigate a report of shots being fired. One of the officers seized the box from the garage and opened it, without a warrant. Later, the officer obtained consent to search the garage from a person who was an overnight guest at the apartment, who had parked her vehicle in the garage from which the box was seized. The district court admitted the evidence on the basis that it inevitably would have been discovered in the consensual search.

Even if we assume that the district court erroneously applied the inevitable discovery exception to the warrant requirement, any error is harmless. There was little testimony about the methamphetamine found in the box, the government did not introduce any physical evidence or chemical analysis of the substance, and the prosecutor did not refer to the evidence in closing argument. There was overwhelming evidence that Aguilar purchased ice methamphetamine in quantities of quarter-pounds and larger from two different suppliers, that he sold ice on numerous occasions in quantities ranging from grams to ounces, and that he and a supplier opened a used car business together as a front for their drug business. Although the evidence against Aguilar consisted largely of the testimony of informants, there is no basis for concluding

that the jury would have rejected the informant testimony in the absence of the evidence of the methamphetamine found in the box.

B.

Aguilar raises two issues relating to his sentence. First, he argues that the district court erred by increasing his base offense level by two levels for his role as a supervisor or manager. The Presentence Report ("PSR") recommended the enhancement based on information that, in an interview with federal agents, a co-defendant, Flores, told the agents that Aguilar employed Matthew Becker as a runner. Aguilar's counsel filed an objection to the PSR, stating: "The defendant denies knowing Matthew Becker and Matthew Becker did not testify at trial." In response to the objection, the government stated that the information was developed as a result of an extensive investigation and numerous statements of witnesses and participants believed to be reliable. In an addendum to the PSR, the probation officer disagreed with Aguilar's objection and stated that the information relied on for the enhancement was derived from a DEA Form 6 prepared by Agent McAuliffe on March 23, 2004, which contains an accurate summary of information provided by Francisco Flores during an interview with government agents.

On June 27, three days before the sentencing hearing, the district court entered an order stating that it had reviewed the PSR and the objections and had tentatively concluded that the objections were without merit. The court stated that it was advising the parties of its tentative conclusion so that it could be taken into account by the parties in determining the presentations to be made at the sentencing hearing. At the sentencing hearing on June 30, the district court asked Aguilar if he wished to offer any evidence in opposition to the PSR, and, through his counsel, he declined. His counsel objected to the enhancement, stating: "It's alleged that Mr. Aguilar supervised a Matthew Becker, and Matthew Becker's name apparently only comes from one of these people who are

felons. And nobody has ever talked to Matthew Becker, no law enforcement agent has talked to a Matthew Becker, or even found that one exists." Aguilar did not testify at the sentencing hearing.

Flores's omission of any mention of a runner in his trial testimony does not make that testimony contradictory or inconsistent with what he told the federal agents in the interview, as reported by the PSR. Because Aguilar did not present any evidence in opposition to the PSR, but simply made a conclusory objection, the district court did not err by adopting the PSR's findings. See United States v. Peters, 283 F.3d 300, 314-15 (5th Cir. 2002) (affirming role enhancement where defendant "objected to the enhancement based on his activities, [but] he did not offer evidence that refuted the findings of the PSR").

Aguilar acknowledges that his second argument with respect to his sentence -- that is, that Crawford v. Washington, 541 U.S. 36 (2004), should apply when hearsay information is used to dramatically increase a defendant's sentence -- is foreclosed by United States v. Beydoun, 469 F.3d 102, 108 (5th Cir. 2006) ("there is no Crawford violation when hearsay testimony is used at sentencing, rather than at trial"). He raises the issue to preserve it for further review.

II.

We now consider the issues raised by Brevick. He argues that his initial trial counsel rendered ineffective assistance by failing to inform him of a plea offer, that the district court erred by admitting evidence of his possession of methamphetamine when he was arrested after the conspiracy had ended, that the district court erred by allowing his common-law wife to testify against him without inquiry into the applicability of the marital privilege, and that the evidence is insufficient to support the district court's findings at sentencing as to the weight and purity of the methamphetamine for which he was held accountable.

A.

Following an evidentiary hearing on Brevick's motion for a new trial based on ineffective assistance, the district court found that the government had never made a plea offer to Brevick's initial trial counsel, but instead that the prosecutor merely mentioned to counsel that the government might be willing to enter into a cooperation agreement with Brevick. The district court found that counsel relayed this conversation to Brevick, and that Brevick indicated that he was not interested. The court concluded that counsel reasonably did not pursue the matter further, and also noted that it probably would not have accepted such a plea. Brevick has not carried his burden of demonstrating that the district court's factual findings are clearly erroneous. We therefore reject his claim of ineffective assistance of counsel.

B.

The indictment alleged that the conspiracy continued until December 14, 2005, the date of the indictment. When Brevick was arrested a little less than three weeks later, on January 4, 2006, at his home, the arresting officers found several baggies of methamphetamine and drug paraphernalia under the bed where Brevick was hiding. The district court overruled Brevick's objection that the evidence was irrelevant, and admitted it as to the issues of intent and absence of mistake or accident. Brevick argues that the evidence was inadmissible under Fed. R. Evid. 404(b), that he did not challenge intent or lack of accident or mistake, and that we must remand because the district court failed to find that the evidence was relevant to a trait other than his character or that its probative value was not substantially outweighed by undue prejudice. See United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc).

Any error in admitting evidence of the methamphetamine seized when Brevick was arrested is harmless. The district court instructed the jury that the seizure of methamphetamine in Brevick's home occurred after the conspiracy

charged in the indictment had ended and thus it was not proof that he participated in the conspiracy, and that the evidence was admitted against Brevick, who was contending that he was not guilty, solely as to the issues of intent and absence of mistake or accident. The government did not refer to the evidence in its closing argument, and the evidence of Brevick's guilt was overwhelming: several witnesses testified that they sold ice methamphetamine to Brevick; other witnesses testified that Brevick supplied ice to them; Brevick was identified by law enforcement officers during surveillance of a warehouse; and another witness, Salee, testified that Brevick opened his own warehouse to distribute ice after Salee's warehouse was shut down.

C.

The district court did not commit reversible error by allowing Lynne Gerganess to testify against Brevick without first conducting a hearing to determine if she voluntarily waived the marital privilege or whether any of her testimony would fall within the scope of marital communications covered by the privilege. On the witness stand, Gerganess testified that she did not consider herself to be Brevick's common-law wife. She disavowed a handwritten declaration, signed by her and Brevick, purporting to declare that they were common-law spouses. Furthermore, Brevick has not identified any testimony by Gerganess that would fall within the scope of the communications aspect of the marital privilege.

D.

The district court rejected Brevick's objections to the PSR and accepted the PSR's determination that Brevick was responsible for more than 1.5 kilograms of ice methamphetamine. Brevick argues that there was no specific, reliable evidence that the methamphetamine was ice as opposed to regular methamphetamine and thus his base offense level should have been 34 rather than 38. We reject this contention. The district court's findings are supported

6

by the evidence presented at trial and by the debriefing statements of Brevick's suppliers, as reported in the PSR, and Brevick offered no evidence to rebut the PSR's findings.

## III.

Finally, we consider the issues raised by Ryan. He argues that there is insufficient evidence to support his conviction for maintaining a drug-involved premises. He also contends that the district court erred by finding that he participated in the underlying drug offense in calculating his base offense level, by denying his motion to suppress, and by finding that it could not consider a co-defendant's plea bargain in deciding whether to grant a downward departure from the Sentencing Guidelines range.

## A.

Ryan argues that the government failed to meet its burden of proving beyond a reasonable doubt that he intended to maintain his residence for the purpose of manufacturing, distributing, or using drugs. He maintains that in the residential context, the manufacture, distribution, or use of drugs must be at least one of the primary or principal uses to which the house is put. He asserts that the evidence at trial established only that people used drugs recreationally at his home, and that the consumption of drugs there was incidental to the primary purpose of residence.

The indictment charged Ryan with violating 21 U.S.C. § 856(a)(1) and (2). To sustain a conviction under § 856(a)(1), "the government must prove that the defendant (1) intentionally and knowingly (2) opened or maintained a place (3) for the purpose of using, manufacturing or distributing a controlled substance." United States v. Roberts, 913 F.2d 211, 219 (5th Cir. 1990). "[T]he government need not prove that drug distribution was the primary purpose of [the defendant's maintaining the place], merely that drug distribution was a significant purpose." United States v. Meshack, 225 F.3d 556, 571 (5th Cir. 2000)

7

(internal quotation marks and citation omitted).  For a violation of § 856(a)(2), the government must prove that the defendant "(1) managed or controlled [a place] (2) either as an owner, lessee, agent, employee or mortgagee and (3) knowingly and intentionally rented, leased or made available for use with or without compensation, the building for the purpose of unlawfully manufacturing, storing, distributing or using a controlled substance."  United States v. Cooper, 966 F.2d 936, 942 n.8 (5th Cir. 1992).  This court has stated that "§ 856(a)(2) is designed to apply to the person who may not have actually opened or maintained the place for the purpose of drug activity, but who has knowingly allowed others to engage in those activities by making the place 'available for use ... for the purpose of unlawfully' engaging in such activity."  United States v. Chen, 913 F.2d 183, 190 (5th Cir. 1990).

Priscilla Pena testified that from 2002 to 2004, she was engaged in the sale and distribution of ice methamphetamine.    She testified that she and Ryan were personal friends and had attended the same elementary and junior high schools.  When asked whether she stored drugs at Ryan's house, she said that occasionally she would leave drugs there if she was going somewhere, but that she usually would go to his house to "hang out" or to meet Steve Hitchcock, who was staying with Ryan at the time and was buying 2 to 4 ounces of ice methamphetamine from her usually every two weeks, if not every week, for a couple of months.  She testified that Ryan knew that she was using his house as a meeting place for sales, and that he was there when some of the sales took place.  She testified further that, on two occasions, she watched Ryan use acetone to wash ice methamphetamine at his home.  Pena testified that when she spoke to Ryan on the telephone, some of the conversations were about arranging to either store or smoke ice methamphetamine and others were social in nature.

Pena testified that she was involved in a romantic relationship with Francisco Flores from 1999-2001,[1] and that they remained friends and were involved in a drug business relationship for about two and one-half years after their romantic relationship ended. Flores testified that he took ice methamphetamine to Pena at Ryan's house and that he smoked ice methamphetamine with Pena and Ryan at Ryan's house.

Pena testified that she purchased a pound of ice methamphetamine from Chris Almaguer and left it in a friend's car. When she went to retrieve the drugs from the friend's car, she learned that the car was at a mall, so Ryan took her to the mall to get the drugs. She testified that Ryan and his girlfriend were fighting and they were afraid that the girlfriend might take the drugs, so Ryan took her to a Wal-Mart to purchase a safe in which to store the drugs at his house.[2] Ryan programmed the electronic code on the safe, and he was the only person who knew the combination. Ryan and Pena stored the safe with the pound of ice in the "smoke room," an upstairs room at Ryan's house that was designated as the place where he and his friends smoked ice.[3] Pena stated that she smoked ice in the smoke room with Ryan and others, and that Ryan occasionally provided ice for other people to smoke. Pena testified that the pound of ice was stored in the safe at Ryan's house only for a day or a couple of days, because he told her she needed to get it out of his house. Law enforcement officers found the safe in the smoke room when they searched Ryan's home after he was arrested.

---

[1] Flores testified that Pena was his girlfriend from 2000 to 2002.

[2] The record contains nothing to indicate the size of the safe. Pena's brother-in-law testified that he saw Ryan and Pena with the safe in the check-out line at the store where they purchased it, so presumably it was not an extremely large or heavy safe.

[3] Ryan's mother testified that the room was also the only place in the house where legal cigarettes were smoked.

Ryan contends that the evidence is insufficient to establish that he maintained his house for the purpose of drug use or distribution and that he was merely helping a friend when he allowed Pena to store the pound of methamphetamine at his house. He explains that the smoking room at his home was maintained to prevent anyone who smoked (legal cigarettes or controlled substances) from "smoking up" the entire house. He contends that he maintained his home for the purpose of residing in it and that any drug activity there was only incidental. It was within the jury's prerogative to weigh the evidence and reject Ryan's explanation. Although not overwhelming, the evidence was sufficient to permit a rational juror to conclude that Ryan knowingly made his home available to others for the purpose of unlawfully storing, distributing, and using ice methamphetamine.

B.

The district court found that Ryan was involved in the underlying drug activity and increased his base offense level to 34, based on 457 grams of methamphetamine, consisting of the pound (453.6 grams) of ice that Ryan and Pena stored in Ryan's home, and the 3.4 grams that Ryan possessed when he was arrested. Ryan argues that his sentence is unconstitutional because it is based on facts he did not admit and which were not proved to a jury beyond a reasonable doubt. He argues that his sentence was improperly enhanced because he was acquitted on the drug conspiracy count and had no involvement with drug activity other than as a casual user.

Ryan's sentence is not unconstitutional. The district court properly treated the guideline range as advisory, and it was free to find the facts used to calculate that range at sentencing by a preponderance of the evidence. The district court's finding that Ryan was involved in the underlying drug activity is supported by the evidence presented at trial and the findings in the PSR. Ryan's acquittal on the conspiracy count does not preclude the district court from

considering Ryan's conduct in the drug conspiracy. United States v. Valdez, 453 F.3d 252, 264 (5th Cir. 2006).

C.

Ryan next raises questions about the legality of his arrest, the search of his automobile, and the consent to search his house. On January 28, 2004, Pena went to Ryan's house to retrieve the pound of ice she had stored there in the safe. When she left, police officers stopped her car, but she refused to consent to a search, so the officers let her go. She drove away, then stopped at a park, where she called Ryan to tell him what had happened. Ryan and his girlfriend left his house and arrived at Pena's location. Pena got into Ryan's vehicle. They headed north, then made a U-turn and returned to Pena's vehicle. Pena got out of Ryan's vehicle and got into her own. Ryan followed Pena closely as they drove away. Officers conducting surveillance stopped Ryan after they saw him change lanes without signaling. He refused to consent to a search of his car, and he was arrested on the traffic violation. When the officers searched his car, they found a small amount of ice.

When Ryan was pulled over, Pena sped away toward the airport. She drove through the airport at 80 miles per hour, and airport police saw her dumping drugs out of her car onto the road. She was eventually apprehended and arrested.

After Pena was apprehended, Ryan signed a consent to search his residence. He told the agents they would find narcotics in the house. During the search, officers found the safe and drug paraphernalia in the smoking room. In a freezer in Ryan's garage, the officers found a jar that contained a "wash" solution consisting of acetone and methamphetamine residue. The district court denied Ryan's motion to suppress evidence of the contents of the jar. Although the district court found that the officers' subjective reason for arresting Ryan was his refusal to consent to a search of his vehicle, it also concluded that they

11

had an objectively reasonable basis for arresting him based on the traffic violation. The court further found that the officers had probable cause to believe that Ryan was engaged in drug trafficking activities at the time he was stopped and that there might be some evidence of that activity in his vehicle.

In his opening brief, Ryan argues that the government failed to establish any basis for the initial stop of his vehicle, and argues that the search of the car and the consent to search his home were all products of the illegal initial stop. In his reply brief, he concedes that there was probable cause for the police to stop his vehicle for changing lanes without signaling, but argues, for the first time, that his arrest was illegal because the sole reason that he was arrested was his refusal to consent to the search of his car.

Generally, we do not consider arguments raised for the first time in a reply brief. United States v. Avants, 367 F.3d 433, 449 (5th Cir. 2004). In any event, the district court correctly concluded that there was no Fourth Amendment violation because the officers had probable cause to arrest Ryan based on the traffic violation. Therefore, his consent to search his home was not the fruit of an illegal arrest, and the district court did not err by admitting evidence of the contents of the jar found in Ryan's freezer.

D.

Ryan argues that the district court erred by concluding that it could not consider the plea agreement and lenient sentence of co-defendant John Grote in deciding whether to depart downward from the Sentencing Guidelines range. Ryan asserts that Grote received a lenient sentence because he is wealthy. Ryan maintains that because he is less culpable than Grote, a downward departure for him is the only way to eliminate the sentencing disparity based on wealth.

We have no jurisdiction to review the denial of a downward departure unless there is some indication in the record that the district court erroneously believed that it lacked authority to depart. United States v. Hernandez, 457 F.3d

416, 424 & n.5 (5th Cir. 2006).  The district court expressed its concern with the leniency of Grote's sentence, but concluded that it would be inappropriate to give the "freaky" sentence of one of Ryan's co-conspirators significant weight. Because the district court was aware of its authority to depart, but exercised its discretion not to do so, its decision not to depart is unreviewable.

IV.

For the foregoing reasons, the appellants' convictions and sentences are

AFFIRMED.