**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 09-4659**

───────────

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

     v.

DOUGLAS LEE STALLWORTH,

              Defendant - Appellant.

───────────

**No. 09-4796**

───────────

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

     v.

BRUCE EDWARD BAUMGARDNER,

              Defendant - Appellant.

───────────

Appeals from the United States District Court for the Western District of Virginia, at Abingdon.  James P. Jones, District Judge. (1:08-cr-00024-jpj-pms-36; 1:08-cr-00024-jpj-pms-41)

───────────

Argued: October 25, 2011        Decided: January 24, 2012

───────────

Before NIEMEYER, GREGORY, and AGEE, Circuit Judges.

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED**: Timothy Worth McAfee, MCAFEE LAW FIRM, PC, Norton, Virginia; Dennis Jones, Lebanon, Virginia, for Appellants. Jennifer R. Bockhorst, OFFICE OF THE UNITED STATES ATTORNEY, Abingdon, Virginia, for Appellee. **ON BRIEF**: Timothy J. Heaphy, United States Attorney, Roanoke, Virginia, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Douglas Stallworth and Bruce Baumgardner were convicted as participants in a large drug-trafficking conspiracy in Bristol, Virginia, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). In addition, Baumgardner was convicted of maintaining a place for the purpose of distributing drugs, in violation of 21 U.S.C. § 856(a)(1). Because each defendant had two prior felony drug convictions, the district court sentenced each to life imprisonment, in accordance with 21 U.S.C. § 841(b)(1)(A).

On appeal, Stallworth and Baumgardner challenge both their convictions and sentences, assigning numerous errors. For the reasons that follow, we affirm.

I

At some time during the 2001-2003 period, Derek Evans, a long-time distributor of crack cocaine, moved from Johnson City, Tennessee, to the Bristol, Virginia/Bristol, Tennessee area ("Bristol") because the drug market in Johnson City had become "too congested." Stallworth told Evans, it would be "a lot easier" in Bristol because the market was "wide open" and there was "no territorial situation" with which to contend.

After Evans moved to Bristol, he together with Bryant Pride, Kerry Lee, and Oedipus Mumphrey headed up a large cocaine distribution operation. For several months in 2005 or 2006,

3

Evans and Lee brought into the area as much as five kilograms of cocaine at a time. And during the period of 2005 to 2007, Mumphrey also supplied Evans with cocaine, making deliveries every week to ten days of up to three kilograms at a time. Evans, Pride, and Mumphrey developed networks, distribution points, and sub-distributors. Evans testified that the conspiracy would purchase a kilogram of cocaine for around $25,000 and then would cook it into crack cocaine, which members were able to sell for between $36,000 and $42,000. He also testified that the conspiracy had from 350 to 500 customers.

On March 28, 2008, 51 persons were indicted and charged with conspiracy to traffic in 50 grams or more of crack cocaine and 500 grams or more of cocaine powder, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Stallworth and Baumgardner were named as two of the conspirators, and, in addition, Baumgardner was charged with maintaining a place for the purpose of distributing illegal drugs, in violation of 21 U.S.C. § 856(a)(1).

A jury convicted Stallworth and Baumgardner of the conspiracy charge and Baumgardner of the charge of maintaining a place for drug distribution. Because each defendant had at least two previous felony drug convictions, the court sentenced each to the statutorily mandated minimum sentence of life imprisonment.

4

Stallworth and Baumgardner filed appeals, each challenging aspects of their convictions and sentences.

II

Stallworth and Baumgardner contend that the evidence was insufficient to convict them of conspiracy. They acknowledge that the evidence shows that they were addicts and customers of the conspiracy, but they argue that a buyer/seller relationship between them and members of the conspiracy does not establish participation in the conspiracy.

We agree that evidence of a simple buyer/seller relationship is insufficient to support a conspiracy conviction. More is required. As we stated in United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc), to be part of a conspiracy a defendant must knowingly and voluntarily become part of the conspiracy. "Only a slight connection need be made linking a defendant to the conspiracy to support a conspiracy conviction." Id. at 862.

In this case, Stallworth and Baumgardner do not take issue with the fact that Evans, Pride, Lee, and Mumphrey headed up a large cocaine distribution conspiracy in the Bristol area. Rather, they argue that the evidence shows only that they were simply customers of that operation and not co-conspirators. In making that argument, however, they overlook several items that

5

were proved at trial. It was Stallworth who persuaded Evans to bring his drug distribution business to Bristol because the market was wide open there. Once Evans established his operation in Bristol, he saw Stallworth virtually every day that the two were out of prison. More importantly, Stallworth assisted Evans by arranging drug transactions and also acted as a street-level distributor. Evans testified, "[Stallworth] called me up. I mean, you know, I seen him about every day. I talked to him, you know, we kick it. He knows people that wants something, wants to get high, I got what they need to get high, so that's the kind of relationship we had. He would come see me, holler at me, I hit him, and that's it." Summarizing the arrangement Evans stated, "When people wanted to get high, they would call [Stallworth] and he would call me, and I would hook-up with [Stallworth], and then he goes serve them." Moreover, the record shows a continuous stream of transactions in which Stallworth bought from Evans three to seven days a week, frequently in distribution quantities. Further, several witnesses testified to buying drugs from Stallworth.

The record reflects much of the same involvement on the part of Baumgardner. He too was a street-level distributor, perhaps selling even more extensively than Stallworth. One of the conspirators, Paul Vaughn, testified that Baumgardner bought a quarter-ounce of crack (roughly 7 grams) from Mumphrey three-

6

to-four times per day in 2007. He was moving so much cocaine that he was known as "VIP." Numerous witnesses testified to buying drugs from Baumgardner, especially at his residence, which was used as a distribution point for cocaine.

As the district court concluded, "In sum, the evidence showed that Baumgardner and Stallworth frequently bought crack from high-level members of the Evans drug organization and sold it to various users on multiple occasions. This certainly qualifies as more than 'evidence of a buy-sell transaction.'" (Quoting United States v. Mills, 995 F.2d 480, 485 n.1 (4th Cir. 1993)).

In addition, Stallworth contends that the evidence did not support the jury's finding that he was involved in distributing at least 50 grams of crack cocaine. But again, this overlooks the evidence. Evans testified that he sold half-gram, gram, and "eight-ball" (roughly 3.5 grams) quantities to Stallworth three times a week whenever the two were both out of jail. Vaughn testified that he witnessed Stallworth purchasing a quarter-ounce from Mumphrey, and Lee testified that he witnessed Stallworth buy from "an eight-ball to a quarter." In view of the testimony that Stallworth was buying and reselling eight-balls and quarter-ounces of crack cocaine regularly over a period of years, the jury had ample evidence from which to conclude that the amount totaled at least 50 grams.

While it is not clear whether Baumgardner is challenging the sufficiency of evidence to support his distribution of 50 grams, the evidence was yet stronger than that for Stallworth. Conspirator Paul Vaughn testified that Baumgardner bought a quarter-ounce three to four times per day during a period in 2007. At that rate, 50 grams was achieved in only three days.

Finally, Baumgardner contends that the evidence was insufficient to show that he maintained a place for the purpose of distributing controlled substances. Baumgardner concedes that crack cocaine was sold from his residence, but he contends that the evidence does not establish that "the sole, primary and/or exclusive 'purpose' for maintaining the residence . . . was for the 'purpose' of distribution of illegal drugs." The case law, however, unanimously construes § 856(a)(1) as not requiring that a residence be maintained exclusively for the distribution of drugs. Obviously, if the defendant lives in the residence, it also has the purpose of housing him. Rather, the defendant must have the distribution of drugs as a specific purpose for the residence, which is more than a mere collateral purpose. See United States v. Soto-Silva, 129 F.3d 340, 346 n.4 (5th Cir. 1997); United States v. Verners, 53 F.3d 291, 295 (10th Cir. 1995); United States v. Roberts, 913 F.2d 211, 220 (5th Cir. 1990).

In this case, evidence shows that Baumgardner maintained his residence for the specific purpose of assisting in the distribution of crack and cocaine. He maintained it as a place for crack addicts to gather, purchase, and use crack cocaine. Three co-conspirators testified that Baumgardner's house was a gathering place and that crack was readily available in the back room of the house, where multiple dealers, including Baumgardner himself, often sold crack cocaine. Moreover, when the police executed a search warrant at the house during the early morning of April 30, 2008, Baumgardner was in his bedroom and four to five others were in the living room. They all appeared to be in a drug-induced state, and several admitted to being "drug sick." Police observed syringes and hypodermic needles throughout the house, as well as crack pipes and other drug paraphernalia. Digital scales were found under the mattress of the bed in which Baumgardner was lying.

In sum, we conclude that there was ample evidence to support the conviction of both defendants.

## III

Stallworth and Baumgardner next contend that they are entitled to a new trial because co-conspirators Evans and Vaughn later recanted testimony they gave against Stallworth and Baumgardner at trial.

A motion for a new trial based on the recantation of testimony by a material government witness may be granted when:

(a) The court is reasonably well-satisfied that the testimony given by a material witness is false;

(b) That without it the jury might have reached a different conclusion; and

(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

United States v. Wallace, 528 F.2d 863, 866 (4th Cir. 1976). And "[t]he failure to meet any one of the Wallace test's three prongs is fatal." United States v. Lighty, 616 F.3d 321, 374-75 (4th Cir. 2010).

In this case, following a hearing on the witnesses' efforts to recant, the court found that the defendants had failed to meet the first prong. It found the recantations "not credible," and stated that it did "not believe that either Vaughn or Evans fabricated their prior trial testimony." The court concluded that while these witnesses' testimony at trial was consistent, "the recantations [were] overwhelmingly inconsistent and unreliable," and that the claims made "fluctuated from one [recantation] letter to the next and in their testimony." The court pointed out that other witnesses corroborated Vaughn's and Evans' trial testimony. It found that since the recantation letters started only after Vaughn was housed in jail with Baumgardner and were written in different handwriting, they

10

"were partly motivated by the pressure or intimidation likely exerted on them by their codefendants in prison, and partly motivated by the misguided and self-created illusion . . . they would somehow avoid punishment for their crimes." Finally, another co-conspirator, Kerry Lee, testified that co-conspirator Charles King "had forced him to write [a recanting letter] while they were jailed together." The court concluded that Evans and Vaughn were trying "to game the system."

We have reviewed the evidence carefully and find that the district court's findings are amply supported by the record and that the court did not abuse its discretion in denying the defendants' motion for a new trial.

IV

Stallworth and Baumgardner contend that they are entitled to a new trial also because the government failed to disclose evidence to them that could have been used to impeach Vaughn, in violation of Giglio v. United States, 405 U.S. 150 (1972). They claim that the government failed to disclose that Detective Majors had promised Vaughn that he would not be charged with drug offenses in state court. While the record is not totally clear about whether the statement was made or who made it, the district court nonetheless concluded that the failure to

11

disclose such statement was not material inasmuch as the result of the trial would not have been any different.

First of all, Vaughn was cross-examined on the fact that his substantial assistance could be recognized in his own federal prosecution. And second, Vaughn's testimony was corroborated by Evans, who also sold cocaine to Baumgardner and Stallworth; by Calhoun and Mead who bought from Baumgardner; and by co-conspirator Norton who bought from Stallworth. The district court concluded, "under these circumstances, the presumed failure to disclose was not material," and we agree.

V

Finally, the defendants challenge their sentences. Stallworth challenges the district court's finding as to drug weight, and both defendants challenge the life sentence as disproportionate under the Eighth Amendment bar against cruel and unusual punishment.

With respect to Stallworth's argument about the drug weight, we conclude that it is irrelevant. Stallworth's Guideline range was not determined by drug weight but by the statutory mandatory minimum sentence required by 21 U.S.C. § 841(b)(1)(A), prescribing a life sentence for a defendant who has "two or more prior convictions for a felony drug offense." In this case there is no dispute that Stallworth had two prior

12

felony drug convictions. Accordingly, any recalculation of his drug amount would be immaterial.

Finally, we reject the argument that the statutorily mandated life sentence for a third felony conviction for drug distribution is cruel and unusual, in violation of the Eighth Amendment. <u>See</u> <u>United States v. D'Anjou</u>, 16 F.3d 604, 613 (4th Cir. 1994); <u>United States v. Kratsas</u>, 45 F.3d 63 (4th Cir. 1995).

Accordingly, the convictions and sentences of Stallworth and Baumgardner are

<u>AFFIRMED</u>.